**CITY OF PETERSBURG, VIRGINIA, municipal building, Petersburg, Virginia, Plaintiff,**

v.

**UNITED STATES of America, and Richard G. Kleindienst, Attorney General of the United States, individually and in his official capacity, United States Department of Justice, Washington, D. C. 20530, Defendants, and Charles P. Royall et al., Defendant-Intervenors.**

Civ. A. No. 509–72.

United States District Court,
District of Columbia.

Oct. 24, 1972.

Judgment Affirmed March 5, 1973.

See 93 S.Ct. 1441.

Mozart G. Ratner, Washington, D. C., John S. Davenport, III, Richmond, Va., for plaintiff.

Peter Mear, Atty., Department of Justice, Washington, D. C., for defendants.

W. H. C. Venable, Richmond, Va., for intervenors William Diamond et al.

Armand Derfner, Washington, D. C., for intervenors Royall et al.

Before MacKINNON, Circuit Judge, and GASCH and BRYANT, District Judges.

## MEMORANDUM OPINION

PER CURIAM:

The City of Petersburg, like all political subdivisions of the Commonwealth of Virginia, is required to clear changes in its voting procedures in accordance with Section 5 of the Voting Rights Act of 1965 as amended, 79 Stat. 439; 42 U.S.C. § 1973c.[1] The Supreme Court has held that annexations and the changes resulting therefrom may be within the scope of that Section where they have a potential for diluting the votes of black citizens. Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971). Accordingly, the City seeks Section 5 clearance for an annexation which added a net of approximately 7,000 white persons to the City, increasing the white population by nearly half and eliminating a black population majority.

On December 21, 1971, the City submitted its annexation to the Attorney General for approval pursuant to the 60-day provision of Section 5. On February 22, 1972, the Attorney General, acting through the Assistant Attorney General, Civil Rights Division, objected to the annexation in a letter to the attorneys for the City of Petersburg which stated that in view of the facts relating to Petersburg, particularly the use of at-large elections for City Councilmen, it was concluded that the reduction in the proportional voting strength of blacks by the addition of a large number of white residents, diluting the votes of black citizens, amounts to a discriminatory effect on voting under the Voting Rights Act.[2]

[1]. 42 U.S.C. § 1973c (1970) provides:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

[2]. Letter of February 22, 1972:

Dear Mr. Davenport:

This is in reference to your submission under Section 5 of the Voting Rights

In this suit, filed on March 17, 1972, the City, as plaintiff, prays for this court's declaratory judgment that the change in its election procedures resulting from the annexation to the City of parts of two adjacent counties while retaining the at-large method of electing City Councilmen, "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." [3]

On motion of the plaintiff City, the court on April 5, 1972, enjoined plaintiff and the Election Board of the City of

Act of 1965 of the 1971 annexation to the City of Petersburg, Virginia . . . .

\* \* \* \* \*

In examining an annexation under Section 5 of the Voting Rights Act, it is incumbent on the Attorney General to determine whether the annexation—either in purpose or effect—results in racial discrimination in voting. In making this evaluation we apply the legal principles which the Courts have developed in the same or analogous situation. Moreover, it is also significant that Section 5 only prohibits implementation of changes affecting voting and provides that such changes may not be enforced without receiving prior approval by the Attorney General or by the District Court for the District of Columbia. Our proper concern then is not with the validity of the annexation but with the changes in voting which proceed from it.

In the case of Petersburg, we can summarize our consideration as follows: The pre-annexation population of Petersburg was made up of 56 percent black citizens and 44 percent white citizens. The city's seven-member governing body was elected at large on a plurality basis. As part of its deliberations the council considered and voted down a proposal that the election of its members be revised so that each would be elected by and would represent a separate district. The annexation was generally supported by both black and white groups, with the exception that some black groups contended that the city should be subdivided into districts to prevent post annexation dilution of the black vote.

The city was expanded by 14 square miles and some 7,000 persons, nearly all of whom were of the white race. The present population is 47 percent black and 53 percent white. The number of councilmen was expanded from five to seven, all of whom are to be elected at at large.

Unquestionably, the above facts indicate that the proportional voting strength of blacks has been reduced. The issue is whether this reduction amounts to a discriminatory effect on voting within the meaning of the Voting Rights Act. We conclude that it does. The reason lies not in the fact of annexation—Congress certainly did not intend for all southern cities to be prevented from annexing any territory. Rather, in re-adopting the at large election system in the context of a significant change of population—from black to white majority—and simultaneously rejecting a proposed ward system, the potential for an adverse and discriminatory voting effect has been written into the Petersburg election law. While the reasons the city advances for using an at large system are credible and would normally present no special problem, in the particular context of Petersburg we are unable to conclude that the at large feature will not have a discriminatory effect on voting rights. Therefore, under the Voting Rights Act we must register objection to its implementation. See Holt v. City of Richmond [334 F.Supp. 228] (E.D.Va., Civil Action No. 151–71–R).

I wish to stress that this ruling relates only to the voting changes occasioned by the annexation. This objection to the implementation of such changes does not affect the validity of the annexation itself. As the Court in the *Holt* case ruled, one way to meet this problem would be to hold separate at large elections for a proportional number of councilmen in the pre-annexation of annexed areas. Another would be to adopt a fairly drawn system of single member wards. The Attorney General will consider withdrawal of this objection if these or other modifications calculated to insure against a racial effect on voting are adopted.

Of course, as provided by Section 5, you have an alternative of instituting an action in the United States District Court for the District of Columbia for declaratory judgment that the changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.

Sincerely,
/s/ David L. Norman
DAVID L. NORMAN
Assistant Attorney General
Civil Rights Division

3. See note 1, *supra.*

Petersburg from conducting any election under Sections 2–1 and 2–3 of Chapter 259 of the Acts of Assembly of Virginia 1961, as amended, until further order of the court. Subsequently the court entered orders allowing Charles P. Royall, et al., and William Diamond, et al., leave to intervene. Trial was had on July 20 and 21, 1972. The evidence consists of several stipulations, various exhibits and testimony of witnesses presented both live and by deposition, and out of it most of the facts emerge practically undisputed.

Petersburg is an independent city in Virginia covering an eight-square-mile area, whose 1970 population was 36,103. In 1971 the City completed steps which it had begun five years earlier to annex 14 square miles of land from adjacent Prince George and Dinwiddie Counties[4] containing 7,323 persons, thus increasing the total population of the new city (as annexed) to 43,426. Before the annexation there were 19,701 (55%) black people, and 16,402 (45%) white people living in the City. Nearly all of the newly acquired group of persons are white and the new city limits include a population of 19,947 (46%) blacks and 23,447 (54%) whites. This amounts to an almost complete reversal percentage-wise in racial makeup.

Although the number of registered voters by race in the old City is not known, calculations based on 1970 census figures indicate that at that time blacks represented about 51% of the registered voters. The same calculations indicate that the annexed area will augment the number of white voters by about 4,800.

The annexation, whose effective date was midnight, December 31, 1971, had been generally supported by the citizens of Petersburg, black and white alike, since the mid-1960's, as a necessary measure to allow the City of expand its tax base and its potential for growth and development. The contours of the annexation were designed to bring in the territory which it was economically feasible to serve, and whose population shared a community of interest with the old City. Joseph H. Owens and Hermanze Fauntleroy, both black, were members of the City Council when it unanimously adopted the annexation ordinance in 1966. In fact, Owens originally introduced the ordinance. Fauntleroy, currently the only black Councilman, testified at the trial that he had no objection to the annexation as such, and regarded it as a feasible step for the City's development.

A map of the city and the surrounding areas is annexed.[5] From this exhibit and the testimony at trial we conclude that the annexation as carried out was fairly intended to accomplish a legitimate governmental purpose. The city limits were expanded into those areas which were most reasonably available and which were the most desirable for accomplishing the legitimate purposes of annexation. The annexation did not include other areas which would have required leaping over the Appomattox River and those lands devoted to Fort Lee (a U. S. Army camp), a state hospital and the adjoining city of Colonial Heights. Because of these barriers annexation beyond those areas was substantially less desirable and even if it had been extended into those areas along with the existing annexation, the racial balance would not have been altered materially over the present result. We thus find nothing in the annexation which indicated that it had a racial purpose.

4. In Virginia, the area embraced within the limits of a city does not include any land within the limits of a county.

5. See attached copy of Plaintiff's Exhibit 1–D.

Petersburg is governed by a City Council of five members.[6] Each member is elected to a four-year term; elections are at staggered intervals of two years, so that three members are elected in each presidential election year and two members are elected in each off year. In each off-year election the Council chooses one of its own members as mayor and also appoints the city manager. All Council members are chosen in at-large elections which are non-partisan, without political party identification, and the candidate must receive a majority of the votes cast to win. Run-off elections are not infrequent.[7]

As elsewhere in Virginia, there has been a long history of racial segregation and discrimination in the City of Petersburg. By various methods in the past blacks have been restricted in their ability to wield effective political influence in relation to their actual numerical strength by limitations on their voting and political participation which resulted from the operation of laws, customs, and official and individual behavior. Until recently, rigid patterns of segregation by law affected nearly every facet of life.

Although state-imposed segregation has been abated, its long continuance in the past caused a dramatic polarization of the races in Petersburg with respect to voting and this result has not been obliterated. An informal white political structure[8] has wielded a controlling influence in city politics and runs only white candidates.[9] Blacks have not been included in activities such as the slating of "tickets" of candidates for Council elections by community-wide groups or organizations and community-wide efforts in support of issues and programs. In recent years a black political structure has also arisen, and they likewise have run only black candidates. They have not sought to compose "slates" with white candidates.

The simple transformation of a potential black voting majority into a clear minority has no effect on relative racial voting strengths unless votes are cast along racial lines. Analysis of past election results clearly indicates that almost total bloc voting by race has been the well established pattern in Petersburg. In recent Council elections, in which both black and white candidates have participated, the vote in precincts which are racially identifiable as being almost completely black or white has been overwhelmingly along racial lines. This is clear from the following charts

6. In 1972 the Virginia legislature approved an increase in the size of the Council from five to seven members. This was accomplished by passage of a special act, which is the way such matters are handled in Virginia.

7. In a run-off election where more than one official is to be elected, a plurality of the vote is sufficient for election.

8. There was no evidence that this was a formal organization or other than the usual type of informal group of like-minded citizens who generally come together, as elsewhere in the United States, when political elections are in the offing.

Testimony showed, however, that the current Democratic Central Committee was composed of 19 white members and 13 black members. The City Council election is nonpartisan.

9. In the city election of 1970, when two Councilmen were to be elected, persons active in the white political structure did inquire of Councilman Fauntleroy as to whether he would be interested in running on a slate with a white candidate. This inquiry included a question as to whether he would be the only black candidate. This discussion was inconclusive and nothing further developed

**1026**

which reflect the results of the last four councilmanic elections.[10]

From this positive showing of racial bloc-voting in the wards which are identifiable as being almost totally black or white it may be inferred that the same type of voting occurs throughout the City of Petersburg in elections affecting local issues. There is no evidence which warrants a contrary conclusion.

It is noted, however, that Councilman Owens, a black, was elected in 1964, at a time when a majority of the registered voting strength of the city was white. In 1966, another black, Councilman Fauntleroy, was elected when the majority voting strength of the city was still white. In 1968, when there was a possibility that by re-electing Mr. Owens and electing another black candidate, the black members would control the council, there was an unusually large turnout of white voters in the white wards,[11] as a result of which Mr. Owens was defeated and the second black candidate also lost. From all the evidence, however, the conclusion is obvious that race has been a dominant factor in Petersburg elections where black candidates opposed white candidates.

The City Council of Petersburg, which has always had a majority of white members, has been generally unresponsive to some of the expressed needs and desires of the black community and has on some occasions rejected or failed to adopt programs, employment policies and appointments recommended by blacks. Without doubt, the same could be said of some programs, policies, and

10. Returns of the 1971 House of Delegates election do not indicate otherwise. The black candidate in that election was duly nominated, but her name did not appear on the official printed ballot, and she ran unsuccessfully as a write-in candidate. Under these circumstances, while the results might have some tendency to indicate bloc-voting, the evidence does not support such a conclusion because the result may have been caused by the absence of her name on the printed ballot, by her name not being well known uniformly throughout the city, or by the nature or extent of her campaign.

| Ward No. | Total Votes Cast for Black Candidate(s) | % of Votes Cast for Black Candidates | Total Votes Cast for White Candidates | % of Votes Cast for White Candidates | Total Votes Cast |
|---|---|---|---|---|---|
| CHART 1, 1964 CITY COUNCIL GENERAL ELECTION ||||||
| 3 * (black) | 339 | 82.3% | 73 | 17.7% | 412 |
| 6 " | 356 | 81% | 85 | 19% | 441 |
| 7 (white) | 110 | 2.7% | 3,949 | 97.3% | 4,059 |
| 8 " | 14 | 3.2% | 713 | 96.8% | 727 |
| CHART 2, 1966 CITY COUNCIL GENERAL ELECTION ||||||
| 3 (black) | 811 | 93.8% | 53 | 6.2% | 864 |
| 6 " | 883 | 92.8% | 69 | 7.2% | 952 |
| 7 (white) | 70 | 1.9% | 3,663 | 98.1% | 3,733 |
| 8 " | 17 | 2.4% | 682 | 97.6% | 699 |
| CHART 3, 1968 CITY COUNCIL GENERAL ELECTION ||||||
| 3 (black) | 725 | 96.9% | 56 | 3.1% | 1,781 |
| 6 " | 951 | 96.7% | 67 | 3.3% | 2,018 |
| 7 (white) | 191 | 2.1% | 8,691 | 97.9% | 8,782 |
| 8 " | 16 | .7% | 2,179 | 99.3% | 2,195 |
| CHART 4, 1970 CITY COUNCIL GENERAL ELECTION ||||||
| 3 (black) | 837 | 90.2% | 91 | 9.8% | 928 |
| 6 " | 965 | 93.5% | 67 | 6.5% | 1,032 |
| 7 (white) | 280 | 8.5% | 3,021 | 91.5% | 3,301 |
| 8 " | 10 | 1.1% | 860 | 98.9% | 870 |

\* Population of Wards 3 and 6, by race, is 42 whites and 10,547 Negroes. Ward 7 has 7,373 whites and 20 Negroes. Ward 8 has 1,796 whites and 2 Negroes.

11. And, presumably, elsewhere in the city.

appointments recommended by some groups of white voters, but the small percentage of black city employees may indicate that black complaints in this respect have merit.[12]

Following annexation, the black member of the City Council, on his own behalf and for the black community, presented and supported a proposal to have members of the City Council elected from single-member districts, as opposed to election at-large. This proposal was made in an effort to reduce the dilutive effect the at-large election would have on black political strength.

We recognize that the election from single-member districts of a number of governmental representatives to a body composed of several members, rather than being elected at-large from the governmental unit, has the effect of making the representatives from the single districts more responsive to the special interests and characteristics of the individual district. Conversely, the election of all such representatives from the governmental unit at-large (as from an entire city) generally causes the representatives to be more responsive to, and characteristic of, the interests of the entire city. Representatives from single districts generally are more responsive to the special interests of their districts, and at-large representatives generally serve the entire community more effectively.

Plaintiff's answer to the proposal to switch to single-member districts is that the advantages of the at-large system when combined with the city manager form of government are so overwhelming that it should not be modified in any way, and that they outweigh any discriminatory effect or disadvantage which might result to the voting strength of blacks in Petersburg. We agree that an at-large system of electing city councilmen has many advantages over the ward system, and that the former method is better calculated to represent majority interests in a city, but the ward system also has some advantages in that it brings the councilman closer to his constituents. Also, to accede to plaintiff's contention in cases such as this would, as a practical matter, exempt all at-large city elections from the provisions of the Voting Rights Act. We do not find that Congress so intended.

In order to obtain the declaratory judgment sought, plaintiff must meet the burden placed upon it by the Voting Rights Act of proving by the preponderance of the evidence that its change in election procedures "does not have the effect of denying or abridging the right to vote on account of race or color." [13]

This is a heavy burden for a community in a state with Virginia's history of past racial discrimination. It requires the plaintiff to prove both that the changed election procedures

(1) Do not have the *purpose* of denying or abridging the right to vote on account of race or color, *and* that they

(2) Do not have the *effect* of denying or abridging the right to vote on account of race or color.

As we have stated, we do not find any evidence here that the changed procedure (the annexation) was for the *purpose* of denying blacks the right to vote on account of race or color. However, notwithstanding the absence of such evidence as to motivation or purpose, in order for plaintiff to prevail in this action it must prove the changes would not have the effect of discrimina-

---

12. General testimony at trial on black employment in the city government revealed the following: 1 out of 70 in the Fire Department; 1 or 2 out of 150–200 clerical positions in City Hall; several in Welfare and very few (1 or 2) in any position of responsibility (Tr. 314–316). There was also expressed a dissatisfaction with black representation on the School Board (Tr. 306–310).

13. See note 1, *supra*. The constitutionality of this burden was upheld in South Carolina v. Katzenbach, 383 U.S. 301, 331–332, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

torily depriving Negroes of the franchise on account of race or color.

It is clear that Congress has placed this burden upon the plaintiff. Congressman McCulloch, the ranking minority member of the House Judiciary Committee, in discussing the burden of proof in Section 5 actions when the 1970 amendments to Section 5 were under consideration, remarked on the floor of the House:

> "*The burden of proof under Section 5 is rightfully placed upon the jurisdiction to show that the new voting law or procedure is not discriminatory.* As in tort law, when circumstances give rise to an inference that there has been misconduct, the party that has access to the facts is called upon to rebut the inference and show that its conduct was proper." (115 Cong. Rec. 38486, December 11, 1969, emphasis added).

In the Senate, similar remarks were made by Senator Fong:

> "There are crucial features of strength contained in Section 5 that I wish to underscore. The first is that *the burden of proof is placed upon the jurisdiction to show that the new voting law or procedure does not have the purpose or effect* of discriminating. Those who know the law or procedure best and what motivated its passage must come forward and explain it."

(116 Cong.Rec. 6154, March 5, 1970, emphasis added).

"This section, in effect, freezes election procedures in the covered areas [Virginia included] unless the changes can be shown to be nondiscriminatory." [14] Opponents of the legislation properly characterized the burden of proof placed on affected governmental units in the covered areas as raising a "presumption of illegality" with regard to changed election procedures; [15] and in South Carolina v. Katzenbach, 383 U.S. 301, 335, 86 S.Ct. 803, 822, 15 L. Ed.2d 769 (1966), the Supreme Court recognized that the statute placed "the burden of proof on the areas seeking relief" and there was "nothing inappropriate" in this. Gaston County v. United States, 395 U.S. 285, 293, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969), is to the same effect.

■ Plaintiff has not met this burden.

The annexation of parts of Dinwiddie and Prince George Counties to the City of Petersburg dilutes the weight, strength and power of the votes of the black voters in the City, with a concomitant effect upon their political influence which is a part of the bundle of individual rights embodied in the franchise as recognized and guaranteed by the Constitution. Perkins v. Matthews, 400 U.S. 379, 388, 91 S.Ct. 431, 27 L.Ed. 2d 476 (1971); [16] Allen v. State Board of

---

14. Joint Views of 10 Members of the [Senate] Judiciary Committee Relating to Extension of the Voting Rights Act of 1965, printed at 116 Cong.Rec. 5519, March 2, 1970.

15. H.R.Rep.No.91–397, 91st Cong., 1st Sess. 14 (1969) (separate view of Rep. Poff, R.Va.). "A Federal law which raises a *presumption of illegality* against a law newly enacted by a State legislature and suspends its operation until the State comes to the Attorney General or a Federal court and proves its legality offends State sovereignty." (Emphasis added.)

16. "Changing boundary lines by annexations which enlarge the city's number of

eligible voters also constitutes the change of a 'standard, practice, or procedure with respect to voting.' Clearly, revision of boundary lines has an effect on voting in two ways: (1) by including certain voters within the city and leaving others outside, it determines who may vote in the municipal election and who may not; (2) it dilutes the weight of the votes of the voters to whom the franchise was limited before annexation, and 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise' . . . . " 400 U.S. at 388, 91 S.Ct. at 437.

Elections, 393 U.S. 544, 569, 189 S.Ct. 817, 22 L.Ed.2d 1 (1969); Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966);[17] Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).[18] The dilution here has occurred as a result of the annexation in the context of at-large elections and bloc-voting by race, and under these circumstances it abridges the right to vote on account of color by impairing the ability of blacks to elect candidates of their choice and to have their ideas on political matters afforded the recognition to which they are entitled on their merits and by virtue of their individual citizenship and their numerical strength in the community.

The *Diamond* intervenors, who limited their participation in the case to the submission of a post-trial memorandum and oral argument, raise an additional issue on the basis of evidence submitted by the other parties. They contend that the annexation *per se*, even with a shift to a ward voting system for councilmanic elections, cannot properly be approved by this Court in a declaratory judgment proceeding under the Voting Rights Act.

First, they argue that this Court's power under the Act is limited in this case to either approving or disapproving the annexation without taking into account the context in which it occurs or any feasible means by which the plaintiffs could annex the areas in question without violating the Act. Second, these intervenors contend that even if this Court does have the power to approve the annexation subject to a change from an at-large to a ward voting system for councilmanic elections, it should not approve this annexation on any conditions for the reason that the election of each of the six "constitutional officers"[19] is necessarily at-large, and would be unaffected by any shift to a ward system for the councilmanic elections. The Court cannot agree with either contention.

In the first place, the *Diamond* intervenors overlook the fact that by requiring plaintiff to shift to a ward voting system for its councilmanic elections, the Court is not, as these intervenors argue, bringing "into play" its "broad equity power." Rather, it is simply declaring that the Petersburg annexation in the context of an at-large voting system would amount to an expansion of an at-large voting system, and that the expansion, on the evidence in this case, is a change in a "practice or procedure with respect to voting" which will have the effect prohibited by the Act. The basis for this conclusion has already been set forth in this opinion.

---

17. "Where the requirements of Reynolds v. Sims are met, apportionment schemes including multi-membered districts will constitute an invidious discrimination only if it can be shown that 'designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to . . . cancel out the voting strength of racial or political elements of the voting population.'" 384 U.S. at 88, 86 S.Ct. at 1294.

18. "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U.S. at 555, 184 S.Ct. at 1378. In South v. Peters, 339 U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1950), Justice Douglas, in dissent, stated:
"The right to vote . . . includes the right to have the vote counted at full value without dilution or discount. That federally protected right suffers substantial diminution . . . [where a] favored group has full voting strength . . . [and] [t]he groups not in favor have their votes discounted."

19. These officers are those whose election is provided for in the Virginia Constitution. They are: Commonwealth's Attorney, the City Treasurer, the Commissioner of Revenue, the Sheriff, the High Constable, and the Clerk of Courts.

The second contention requires somewhat fuller discussion. In particular, it requires consideration of the purpose of Congress in enacting Section 5 of the Voting Rights Act. Congress deliberately used broad language so as to bring under federal scrutiny the many different means by which jurisdictions in the areas covered by the Act might seek to evade the requirements of the Fifteenth Amendment.[20] The breadth of this coverage has been clearly delineated by the Supreme Court in Perkins v. Matthews, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), and Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). Similarly, Congress used general, although clear, language in describing the kinds of changes in voting practices or procedures which were forbidden under the Act. They are those which have the purpose or effect of "denying or abridging the right to vote on account of race or color." 79 Stat. 439, 42 U.S.C. § 1973c. It is left for a three-judge court to determine whether a given change constitutes the kind of denial or abridgment which Congress had in mind. The plaintiff, as already noted, carries the burden of proving that its proposed change does not fall within this category.

If the view of the *Diamond* intervenors concerning what constitutes a denial or abridgment in annexation cases were to prevail, no court could ever approve any annexation in areas covered by the Voting Rights Act if there were a history of racial bloc-voting in local elections for any office and if the racial balance were to shift in even the smallest degree as a result of the annexation.[21] It would not matter that the annexation was essential for the continued economic health of a municipality or that it was favored by citizens of all races; because if the demographic makeup of the surrounding areas were such that any annexation would produce a shift of majority strength from one race to another, a court would be required to disapprove it without even considering any other evidence, and the municipality would be effectively locked into its original boundaries. This Court cannot agree that this was the intent of Congress when it enacted the Voting Rights Act.

In support of their position the *Diamond* intervenors cite Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1960). Certainly they are correct in looking to Supreme Court decisions in Fifteenth Amendment cases to cast light upon the nature of the discrimination which the Voting Rights Act is designed to eliminate.[22] However, this reliance on *Gomillion* is misplaced, for the facts in the instant case are very different from the naked racial gerrymander with which *Gomillion* dealt.[23] Plaintiff's compelling evidence demonstrating the necessity for this annexation stands in sharp contrast to its plausible but clearly disputable arguments in favor of retaining an at-large voting

20. See, e. g., the remarks of Senator Hart, 111 Cong.Rec. 8303, and of Senator Tydings, 111 Cong.Rec. 10725–27 concerning the problem of changes made by Southern states and municipalities in an effort to circumvent the vindication of the Fifteenth Amendment rights of their black citizens.

21. It should be noted that a literal reading of the Act, coupled with a mechanistic approach to determining whether the franchise has been denied or abridged would require a court to disapprove an annexation which shifted the population ratio from a white to a black majority.

22. The Act was enacted pursuant to Congressional power to enforce the guarantees of the Fifteenth Amendment. South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

23. The *Gomillion* court observed that the redrawing of boundaries was, if petitioners' allegations were true, "solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their preexisting municipal vote." 364 U.S. 339, 341, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

system for the councilmanic elections and thereby creating the clear possibility of totally excluding black citizens from participation in the city government.

■ The Court concludes then, that this annexation, insofar as it is a mere boundary change and not an expansion of an at-large system, is not the kind of discriminatory change which Congress sought to prevent; but it also concludes, in accordance with the Attorney General's findings, that this annexation can be approved only on the condition that modifications calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters are adopted, i. e., that the plaintiff shift from an at-large to a ward system of electing its city councilmen.

In coming to this conclusion with respect to the argument of the intervenors as to the constitutional officers, we take note of several factors:

■ First, the statute places the responsibility of the initial decision in the Attorney General and he has objected to the voting changes only insofar as they apply to the at-large election of councilmen. His interpretation of this section of the statute, as applied to the facts of this case, is entitled to deference.[24] Also, a substantial number of black citizens approve of the annexation with the change to the ward system.

Second, the voters added to the City of Petersburg by the annexation never previously voted for any city officers. Hence their inclusion in the voting population of the city was a substantial departure from past practices. However, we conclude from the governmental organization of the State of Virginia that these annexed voters did previously vote for "constitutional officers" in their previous district.[25] So in this respect,

the annexation was more in the nature of a reapportionment and no evidence was introduced that the change in apportionment created an unfair situation.

Third, to change to the ward system of electing councilmen will most certainly result in a present increase in black representation on the City Council that has every prospect of being permanent. Thus, the force of black voting strength will be increased over the results they have been able presently to achieve even with a majority of the voters. We recognize that it is arguable that black citizens might be able to obtain even greater representation in old Petersburg if the annexation were prohibited, but the smaller city would not be as viable a political unit and the percentage figures which represent the relative voting strengths of the two races after the annexation are not so disparate that, given the proven defection from absolute bloc voting that exists here, the resulting representation and government would not be fairly representative of both races. Under the annexation, the relative voting strengths of the two races are close to being equal and control of the City Council could go either way and might shift from election to election, depending on the interests of the voters in any given election, the qualifications of the candidates, and the apportionment of the Council districts.

None of these factors are dispositive in themselves, but taken together we believe they support our conclusion, which affirms the decision of the Attorney General.

Accordingly, the declaratory judgment sought by plaintiff is denied. Counsel will submit an appropriate order. We retain jurisdiction of the case to consider any matters which may arise in the future under our decision.

24. Perkins v. Matthews, 400 U.S. 379, 390–391, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971).

25. Const. of Va. (1902) §§ 110, 118, 119, 120; Code of Va. (1950) § 24–156; cf. Const. of Va. (1971), Art. VII, Sched. §§ 2, 3.

GENERAL LAND USE PLAN
FOR AREA PROPOSED FOR ANNEXATION
L E G E N D

CITY OF
PETERSBURG
VIRGINIA
AND VICINITY

[A7356]