CITY OF RICHMOND, VIRGINIA *v.* UNITED
STATES ET AL.

No. 74–201.   Argued April 23, 1975—Decided June 24, 1975

*Charles S. Rhyne* argued the cause for appellant. With him on the briefs were *David M. Dixon, Daniel T. Balfour, Conrad B. Mattox, Jr., Horace H. Edwards,* and *John S. Davenport III.*

*Deputy Solicitor General Wallace* argued the cause for the United States et al. in support of the appellant. With him on the brief were *Solicitor General Bork, Assistant Attorney General Pottinger, Keith A. Jones,* and *Brian K. Landsberg.*

*Armand Derfner* argued the cause for appellees Crusade for Voters of Richmond et al. With him on the brief were *James P. Parker* and *J. Harold Flannery. W. H. C. Venable* argued the cause for appellees Holt et al. With him on the brief was *John M. McCarthy.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c,[1] a State or subdivision thereof subject to the Act may not enforce any

---

[1] Section 5, 42 U. S. C. § 1973c, provides:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) based upon determinations made under the first sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b (a) of this title based upon determinations made under the second sentence of section 1973b (b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided*, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court."

change in "any voting qualification or prerequisite to voting" unless such change has either been approved by the Attorney General or that officer has failed to act within 60 days after submission to him, or unless in a suit brought by such State or subdivision the United States District Court for the District of Columbia has issued its declaratory judgment that such change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . ." *Perkins* v. *Matthews,* 400 U. S. 379 (1971), held that § 5 reaches the extension of a city's boundaries through the process of annexation. Here, the city of Richmond annexed land formerly in Chesterfield County, and the issue is whether the city in its declaratory judgment action brought in the District Court for the District of Columbia has carried its burden of proof of demonstrating that the annexation had neither the purpose nor the effect of denying or abridging the right to vote of the Richmond Negro community on account of its race or color.

I

The controlling Virginia statutes [2] permit cities to annex only after obtaining a favorable judgment from a specially constituted three-judge annexation court. In 1962, the city sought judicial approval of two annexation ordinances, one seeking to annex approximately 150 square miles of Henrico County and the other approximately 51 square miles of Chesterfield County. The Henrico case, which was protracted, proceeded first. In 1965, the annexation court authorized the annexation of 16 square miles of Henrico County; but because of a $55 million financial obligation which, as it turned out, annexation would entail, the city council determined

[2] Va. Code Ann. § 15.1–1032 *et seq.* (1973 and Supp. 1975).

that the annexation was not in the city's best interest. The Henrico case was accordingly dismissed.

The city then proceeded with the Chesterfield case. In May 1969, a compromise line was approved by the city and Chesterfield County and incorporated in a decree of July 12, 1969,[3] which awarded the city approximately 23 square miles of land adjacent to the city in Chesterfield County. The preannexation population of the city as of 1970 was 202,359, of which 104,207 or 52% were black citizens. The annexation added to the city 47,262 people, of whom 1,557 were black and 45,705 were nonblack. The postannexation population of the city was therefore 249,621, of which 105,764 or 42% were Negroes. The annexation became effective on January 1, 1970, and the city has exercised jurisdiction over the area since that time.[4]

Before and immediately after annexation, the city had a nine-man council, which was elected at large. In 1968, three candidates endorsed by the Crusade for Voters of Richmond, a black civic organization, were elected to the council. In the postannexation, at-large election in 1970, three of the nine members elected had also received the endorsement of the Crusade.

On January 14, 1971, a divided Court in *Perkins* v. *Matthews, supra,* held that § 5 of the Voting Rights Act applied to city annexations. On January 28, 1971, the city of Richmond sought the Attorney General's approval of the Chesterfield annexation. On May 7, 1971, after requesting and receiving additional materials from the city, the Attorney General declined to approve the

[3] A writ of error was refused by the Supreme Court of Appeals of Virginia. *Deerbourne Civic & Recreation Assn.* v. *City of Richmond,* 210 Va. li–lii (1969), cert. denied, 397 U. S. 1038 (1970).

[4] A motion to stay the effective date of the annexation was denied separately by individual Justices of this Court.

voting change, which he deemed the annexation to represent, saying that the annexation substantially increased the proportion of whites and decreased the proportion of blacks in the city and that the annexation "inevitably tends to dilute the voting strength of black voters." 1 App. 24. The Attorney General suggested, however, that "[y]ou may, of course, wish to consider means of accomplishing annexation which would avoid producing an impermissible adverse racial impact on voting, including such techniques as single-member districts." *Ibid.* Following reversal by this Court of the District Court's judgment in *Chavis* v. *Whitcomb,* 305 F. Supp. 1364 (SD Ind. 1969), rev'd, 403 U. S. 124 (1971), a decision on which the Attorney General had relied in disapproving the Chesterfield annexation, the city's request for reconsideration was denied by the Attorney General on September 30, 1971, again with the suggestion that "single-member, non-racially drawn councilmanic districts" would be "one means of minimizing the racial effect of the annexation . . . ." 1 App. 32.

Meanwhile on February 4, 1971, respondent Curtis Holt brought an action (*Holt I*) in the United States District Court for the Eastern District of Virginia, asserting that the annexation denied Richmond Negroes their rights under the Fifteenth Amendment. In November 1971, the District Court ruled in that suit that the annexation had had an illegal racial purpose and ordered a new election of the city council, seven councilmen to be elected at large from the old city and two primarily from the annexed area. *Holt* v. *City of Richmond,* 334 F. Supp. 228. The Court of Appeals for the Fourth Circuit, sitting en banc, reversed on May 3, 1972, 459 F. 2d 1093, cert. denied, 408 U. S. 931 (1972), holding that no Fifteenth Amendment rights were violated, that the city had valid reasons for seeking to annex in 1962, and

that the record would support no finding that the 1969 annexation was not motivated by the same considerations.

On December 9, 1971, Holt began another suit (*Holt II*) in the Eastern District of Virginia, this time seeking to have the annexation declared invalid under § 5 of the Voting Rights Act for failure to have secured either the approval of the Attorney General or of the United States District Court for the District of Columbia. As the result of this litigation, which was stayed pending the outcome of the present suit, further city council elections have been enjoined and the council elected in 1970 has remained in office.

Upon denial of certiorari in *Holt I, supra,* the Attorney General was again asked to modify his disapproval of the annexation because of the Fourth Circuit's decision that no impermissible purpose had accompanied the annexation and that Fifteenth Amendment rights had not been violated. Receiving no response from the Attorney General, the city filed the present suit in the United States District Court for the District of Columbia on August 25, 1972, seeking approval of the annexation and relying on the Fourth Circuit's decision in *Holt I.* Respondent Holt and the Crusade for Voters intervened.

Shortly thereafter, *City of Petersburg* v. *United States,* 354 F. Supp. 1021 (1972), was decided by the United States District Court for the District of Columbia. There, the District Court held invalid an annexation by a Virginia city, where at-large council elections were the rule both before and after the annexation, but indicated that approval could be had "on the condition that modifications calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters are adopted, i. e., that the plaintiff shift from an at-large to a ward system of electing its city councilmen." *Id.,* at 1031. We affirmed that judgment. 410 U. S. 962 (1973).

Thereafter, Richmond developed and submitted to the Attorney General various plans for establishing councilmanic districts in the city. With some modification, to which the city council agreed, the Attorney General indicated approval of one of these plans. This was a nine-ward proposal under which four of the wards would have substantial black majorities, four wards substantial white majorities, and the ninth a racial division of approximately 59% white and 41% black. The city and the Attorney General submitted this plan to the District Court for the District of Columbia in the form of a consent judgment. The intervenors opposed it, and the District Court referred the case to a Special Master for hearings and recommendations.[5] The Special Master submitted recommended findings of fact and conclusions of law. Based on the statements of various officials of the city and other events which he found to have taken place, the Master concluded that the city had not met its burden of proving that the annexation did not have the purpose of diluting the right of black persons to vote, and that the ward plan did not cure the discriminatory racial purpose accompanying the annexation. In addition, he concluded that in any event the diluting effect of the annexation had not been dissipated to the greatest extent reasonably possible, that the city had not demonstrated any acceptable counterbalancing economic and administrative benefits, and that deannexation was the only acceptable remedy for the violations of § 5 which had been found.

The District Court, 376 F. Supp. 1344 (1974), essentially accepted the findings and conclusions of the Special

---

[5] The parties stipulated to the record in *Holt I*, and the Special Master referred in his decision to that record and to the three days of testimony which he heard. See 376 F. Supp. 1344, 1349 (DC 1974).

Master except for his recommendation with respect to deannexation. Based on the Special Master's findings, the District Court concluded that the city's "1970 changes in its election practices following upon the annexation were discriminatory in purpose and effect and thus violative of Section 5's substantive standards as well as the section's procedural command that prior approval be obtained from the Attorney General or this court." *Id.,* at 1352. The District Court went on to hold that the invidious racial purpose underlying the annexation had not been eliminated since no "objectively verifiable, legitimate purpose for annexation" had been shown and since the ward plan does not effectively eliminate or sufficiently compensate for the dilution of the black voting power resulting from the annexation. *Id.,* at 1353–1354. Furthermore, in fashioning the ward system the city had not, the court held, minimized the dilution of black voting power to the greatest possible extent, relying for this conclusion on another ward plan presented by intervenors which would have improved the chance that Negroes would control five out of the nine wards. The annexation could not be approved, therefore, because it also had the forbidden effect of denying the right to vote of the Negro community in Richmond.

The District Court, however, declined to order deannexation, and left the matter of the remedy to be fashioned in *Holt II,* still pending in the Eastern District of Virginia. We noted probable jurisdiction, 419 U. S. 1067 (1974).

## II

We deal first with whether the annexation involved here had the effect of denying or abridging the right to vote within the contemplation of § 5 of the Voting Rights Act.

*Perkins* v. *Matthews, supra,* held that changes in city boundaries by annexation have sufficient potential for denying or abridging the right to vote on account of race or color that prior to becoming effective they must have the administrative or judicial approval required by § 5. But it would be difficult to conceive of any annexation that would not change a city's racial composition at least to some extent; and we did not hold in *Perkins* that every annexation effecting a reduction in the percentage of Negroes in the city's population is prohibited by § 5. We did not hold, as the District Court asserted, that "[i]f the proportion of blacks in the new citizenry from the annexed area is appreciably less than the proportion of blacks living within the city's old boundaries, and particularly if there is a history of racial bloc voting in the city, the voting power of black citizens as a class is diluted and thus abridged," 376 F. Supp., at 1348 (footnote omitted), and that the annexation thus violates § 5 and cannot be approved.

In *City of Petersburg* v. *United States, supra,* the city sought a declaratory judgment that a proposed annexation satisfied the standards of § 5. Councilmen were elected at large; Negroes made up more than half the population, but less than half the voters; and the area to be annexed contained a heavy white majority. A three-judge District Court for the District of Columbia, although finding no evidence of a racially discriminatory purpose, held that in the context of at-large elections, the annexation would have the effect of denying the right to vote because it would create or perpetuate a white majority in the city and, positing racial voting which was found to be prevalent, it would enhance the power of the white majority totally to exclude Negroes from the city council. The court held, however, that a reduction of a racial group's relative political

strength in the community does not always deny or abridge the right to vote within the meaning of § 5:

"If the view of the *Diamond* intervenors concerning what constitutes a denial or abridgment in annexation cases were to prevail, no court could ever approve any annexation in areas covered by the Voting Rights Act if there were a history of racial bloc-voting in local elections for any office and if the racial balance were to shift in even the smallest degree as a result of the annexation. It would not matter that the annexation was essential for the continued economic health of a municipality or that it was favored by citizens of all races; because if the demographic makeup of the surrounding areas were such that any annexation would produce a shift of majority strength from one race to another, a court would be required to disapprove it without even considering any other evidence, and the municipality would be effectively locked into its original boundaries. This Court cannot agree that this was the intent of Congress when it enacted the Voting Rights Act." 354 F. Supp., at 1030 (footnote omitted).

The court went on to hold that the effect on the right to vote forbidden by § 5, which had been found to exist in the case, could be cured by a ward plan for electing councilmen in the enlarged city:

"The Court concludes then, that this annexation, insofar as it is a mere boundary change and not an expansion of an at-large system, is not the kind of discriminatory change which Congress sought to prevent; but it also concludes, in accordance with the Attorney General's findings, that this annexation can be approved only on the condition that modifications calculated to neutralize to the extent possible

any adverse effect upon the political participation of black voters are adopted, i. e., that the plaintiff shift from an at-large to a ward system of electing its city councilmen." *Id.,* at 1031.

The judgment entered by the District Court in the *Petersburg* case, although refusing the declaratory judgment in the context of at-large elections, retained jurisdiction and directed that "plaintiff prepare a plan for conducting its city council elections in accordance with the requirements of the Voting Rights Act as interpreted by this Court . . . ." Jurisdictional Statement in *City of Petersburg* v. *United States,* No. 72–865, O. T. 1972, p. 25a. In its appeal, the city presented the question, among others, whether the District Court was correct in conditioning approval of the annexation upon the adoption of the plan to elect councilmen by wards. We affirmed the judgment without opinion. 410 U. S. 962 (1973).

*Petersburg* was correctly decided. On the facts there presented, the annexation of an area with a white majority, combined with at-large councilmanic elections and racial voting, created or enhanced the power of the white majority to exclude Negroes totally from participation in the governing of the city through membership on the city council. We agreed, however, that that consequence would be satisfactorily obviated if at-large elections were replaced by a ward system of choosing councilmen. It is our view that a fairly designed ward plan in such circumstances would not only prevent the total exclusion of Negroes from membership on the council but would afford them representation reasonably equivalent to their political strength in the enlarged community.

We cannot accept the position that such a single-member ward system would nevertheless have the effect of denying or abridging the right to vote because Negroes

would constitute a lesser proportion of the population after the annexation than before and, given racial bloc voting, would have fewer seats on the city council. If a city having a ward system for the election of a nine-man council annexes a largely white area, the wards are fairly redrawn, and as a result Negroes have only two rather than the four seats they had before, these facts alone do not demonstrate that the annexation has the effect of denying or abridging the right to vote. As long as the ward system fairly reflects the strength of the Negro community as it exists after the annexation, we cannot hold, without more specific legislative directions, that such an annexation is nevertheless barred by § 5. It is true that the black community, if there is racial bloc voting, will command fewer seats on the city council; and the annexation will have effected a decline in the Negroes' relative influence in the city. But a different city council and an enlarged city are involved after the annexation. Furthermore, Negro power in the new city is not undervalued, and Negroes will not be underrepresented on the council.

As long as this is true, we cannot hold that the effect of the annexation is to deny or abridge the right to vote. To hold otherwise would be either to forbid all such annexations or to require, as the price for approval of the annexation, that the black community be assigned the same proportion of council seats as before, hence perhaps permanently overrepresenting them and underrepresenting other elements in the community, including the nonblack citizens in the annexed area. We are unwilling to hold that Congress intended either consequence in enacting § 5.

We are also convinced that the annexation now before us, in the context of the ward system of election finally proposed by the city and then agreed to by the United

States, does not have the effect prohibited by § 5. The findings on which this case was decided and is presented to us were that the postannexation population of the city was 42% Negro as compared with 52% prior to annexation. The nine-ward system finally submitted by the city included four wards each of which had a greater than a 64% black majority. Four wards were heavily white. The ninth had a black population of 40.9%. In our view, such a plan does not undervalue the black strength in the community after annexation; and we hold that the annexation in this context does not have the effect of denying or abridging the right to vote within the meaning of § 5. To the extent that the District Court rested on a different view, its judgment cannot stand.

## III

The foregoing principles should govern the application of § 5 insofar as it forbids changes in voting procedures having the effect of denying or abridging the right to vote on the grounds of race or color. But the section also proscribes changes that are made with the purpose of denying the right to vote on such grounds. The District Court concluded that when the annexation eventually approved in 1969 took place, it was adopted by the city with a discriminatory racial purpose, the precise purpose prohibited by § 5, and that to purge itself of that purpose the city was required to prove two factors, neither of which had been successfully or satisfactorily shown: (1) that the city had some objectively verifiable, legitimate purpose for the annexation at the time of adopting the ward system of electing councilmen in 1973; and (2) that "the ward plan not only reduced, but also effectively eliminated, the dilution of black voting power caused by the annexation . . . ." 376 F. Supp., at 1353 (footnote omitted). The Master's findings were

accepted to the effect that there were no current, legitimate economic or administrative reasons warranting the annexation. As for the second requirement, the ward plan failed to afford Negroes the political potential comparable to that which they would have enjoyed without the annexation, because they would soon have had a majority of the voting population in the old city and would have controlled the council, and because, in any event, it was doubtful that their political power under the proposed ward system in the enlarged community was equivalent to their influence in the old city under an at-large election system.

The requirement that the city allocate to the Negro community in the larger city the voting power or the seats on the city council in excess of its proportion in the new community and thus permanently to underrepresent other elements in the community is fundamentally at odds with the position we have expressed earlier in this opinion, and we cannot approve treating the failure to satisfy it as evidence of any purpose proscribed by § 5.

Accepting the findings of the Master in the District Court that the annexation, as it went forward in 1969, was infected by the impermissible purpose of denying the right to vote based on race through perpetuating white majority power to exclude Negroes from office through at-large elections,[6] we are nevertheless persuaded

---

[6] The city contends that the decision of the Court of Appeals in *Holt I* should be given estoppel effect in this case on the question of the purpose behind the annexation. In its view, the earlier decision as to purpose is binding on all the parties participating in the *Holt I* litigation, and although the United States and the Attorney General did not participate in that litigation, the city asserts that they are in agreement with the city's position in this case. The District Court rejected the city's argument by pointing to the fact that the burden of proof was not on the city in the *Holt I* pro-

that if verifiable reasons are now demonstrable in support of the annexation, and the ward plan proposed is fairly designed, the city need do no more to satisfy the requirements of § 5. We are also convinced that if the annexation cannot be sustained on sound, nondiscriminatory grounds, it would be only in the most extraordinary circumstances that the annexation should be permitted on condition that the Negro community be permanently overrepresented in the governing councils of the enlarged city. We are very doubtful that those circumstances exist in this case; for, as far as this record is concerned, Chesterfield County was and still is quite ready

---

ceedings although that burden is on Richmond in this case, and to the different legal bases of the two cases, with different authorities applicable in each. 376 F. Supp., at 1352 n. 43. Whatever the merits of the District Court's position on this collateral-estoppel issue, we find controlling the nonparticipation of the United States and the Attorney General in the *Holt I* case. The federal parties explicitly reject the estoppel argument of the city, Brief for the Federal Parties 16–17, n. 4, and, whatever support the United States presently gives to the city's annexation, it now recommends that the case be remanded to the District Court for the taking of further evidence and the making of further findings on the question of the city's purpose:

"We believe that the evidence in the record would support a finding that the City has objectively verifiable, legitimate reasons for retaining the annexed area. However, the parties at trial did not directly litigate that question. The parties, including the federal parties, concentrated on the extent to which the City's ward plan minimized the dilutive effects of the annexation, *i. e.*, on the permissibility of the effect of the voting change under *City of Petersburg*, and not on the nondiscriminatory purposes that might justify retention of the annexed area. Thus the City did not develop and present all its evidence relating to such purposes, and the intervening defendants have not had a full opportunity to rebut such evidence." *Id.*, at 34–35.

Given this position of the United States, we conclude that *Holt I* should not be given estoppel effect in this case.

to receive back the annexed area, to compensate the city for its capital improvements, and to resume governance of the area. It would also seem obvious that if there are no verifiable economic or administrative benefits from the annexation that would accrue to the city, its financial or other prospects would not be worsened by deannexation.

We need not determine this matter now, however; for if, as we have made clear, the controlling factor in this case is whether there are now objectively verifiable, legitimate reasons for the annexation, we agree with the United States that further proceedings are necessary to bring up to date and reassess the evidence bearing on the issue. We are not satisfied that the Special Master and the District Court gave adequate consideration to the evidence in this case in deciding whether there are now justifiable reasons for the annexation which took place on January 1, 1970. The special, three-judge court of the State of Virginia made the annexation award, giving great weight to the compromise agreement, but nevertheless finding that "Richmond is entitled to some annexation in this case. . . . Obviously cities must in some manner be permitted to grow in territory and population or they will face disastrous economic and social problems." 1 App. 42. The court went on to find that the annexation met all of the "requirements of necessity and, most important of all, expediency," *id.*, at 47, expediency in the sense that it is " 'advantageous' and in furtherance of the policy of the State that 'urban areas should be under urban government and rural areas under county government.' " *Id.*, at 44.

In *Holt I*, where the annexation was attacked under the Fifteenth Amendment as being a purposeful plan to deprive black citizens of their constitutional right to vote without discrimination on grounds of race, the Court

of Appeals for the Fourth Circuit, en banc, concluded that the plaintiffs had not proved a purposeful design to annex in order to deprive Negro citizens of their political rights. The majority expressly held that there were legitimate grounds for annexing part of Chesterfield County in 1962 and that the proof was inadequate to show that these grounds had been replaced by impermissible racial purposes in 1969. The District Court had come to a contrary conclusion with respect to the 1969 annexation but, according to the Court of Appeals, had itself "found that annexation rested upon such firm non-racial grounds that it was necessary, expedient and inevitable." [7] The two dissenting judges both were of the view that, absent an impermissible racial purpose, the annexation would have been legally acceptable even though the Negro proportion in the community was thereby diminished. One of the dissenters said: "Since there is no reason to question that some annexation, at

[7] The Court of Appeals said in this respect, 459 F. 2d 1093, 1097 (1972):

"In 1961 there were compelling reasons for annexation of portions of Chesterfield County. Negroes were then a minority in Richmond and no one was then thinking in terms of a possible cleavage between black and white voters. Race was not a factor in the decision to seek annexation. Indeed, the finding was that, without the settle-. ment agreement, the annexation court would have awarded more territory, and a larger preponderance of white voters, to Richmond.

.     .     .     .     .

"The District Court recognized, however, that there was no racial motivation in the institution of the annexation proceeding or in its prosecution. If some members of Richmond's governing body had developed a sense of urgency because of the growing number of black voters and their supposed opposition to any annexation and the election of 'Richmond Forward' candidates, no such thoughts were believed to have infected the minds of the judges of the annexation court. In fact, the District Court found that annexation rested upon such firm non-racial grounds that it was necessary, expedient and inevitable."

least as great in geographical scope, would have been decreed had the proceedings run their course and since, from my reading of the record, there could not have been an annexation of territory without an annexation of people and consequent dilution of the black vote, I approve of the district judge's fashioning relief solely by ordering a new election of council members under conditions where the black vote could not be diluted." 459 F. 2d, at 1111 (Winter, J., dissenting).

In the present case the District Court stated that it had no doubt that "Richmond's leadership was motivated in 1962 by nondiscriminatory goals in filing its 1962 annexation suit," 376 F. Supp., at 1354 n. 52, but went on to accept the Master's findings that the annexed area was a financial burden to the city and that there were no administrative or other advantages justifying the annexation. As for the contrary evidence in the record, the District Court asserted that "[t]hese evidentiary references to *Holt* were, of course, considered by the Master in making his findings," and summarily concluded, without discussion, that the contrary evidence did not "persuade us that the Master's findings are wrong, nor do they dissipate the evidence of illegal purpose which permeates this record." *Id.*, at 1354 (footnote omitted).[8]

In making his findings, however, it appears to us that the Special Master may have relied solely on the testimony of the county administrator of Chesterfield County who had opposed any annexation and was an obviously interested witness. At least there is no indication from the Special Master's findings or conclusions that he gave any attention to the contrary evidence in the record.

---

[8] A study by the Urban Institute showing a 1971 fiscal year surplus from the annexed area was not part of the record, the District Court said, and "could not in any case remove the doubts created by testimony at the hearing." 376 F. Supp., at 1354 n. 51.

The city now claims that the issues before the Special Master did not encompass the possible economic and administrative advantages of the annexation agreed upon in 1969. Given our responsibilities under § 5, we should be confident of the evidentiary record and the adequacy of the lower court's consideration of it. In this case, for the various reasons stated above, we have sufficient doubt that the record is complete and up to date with respect to whether there are now justifiable reasons for the city to retain the annexed area that we believe further proceedings with respect to this question are desirable.

## IV

We have held that an annexation reducing the relative political strength of the minority race in the enlarged city as compared with what it was before the annexation is not a statutory violation as long as the post-annexation electoral system fairly recognizes the minority's political potential. If this is so, it may be asked how it could be forbidden by § 5 to have the purpose and intent of achieving only what is a perfectly legal result under that section and why we need remand for further proceedings with respect to purpose alone. The answer is plain, and we need not labor it. An official action, whether an annexation or otherwise, taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under the statute. Section 5 forbids voting changes taken with the purpose of denying the vote on the grounds of race or color. Congress surely has the power to prevent such gross racial slurs, the only point of which is "to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights." *Gomillion* v. *Lightfoot*, 364 U. S. 339, 347 (1960). Annexations animated by such a purpose have no credentials what-

soever; for "[a]cts generally lawful may become unlawful when done to accomplish an unlawful end . . . ." *Western Union Telegraph Co.* v. *Foster,* 247 U. S. 105, 114 (1918); *Gomillion* v. *Lightfoot, supra,* at 347. An annexation proved to be of this kind and not proved to have a justifiable basis is forbidden by § 5, whatever its actual effect may have been or may be.

The judgment of the District Court is vacated and the case is remanded to that court for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join, dissenting.

The District Court, applying proper legal standards, found that the city of Richmond had failed to prove that its annexation of portions of Chesterfield County, Va., on January 1, 1970, had neither the purpose nor the effect of abridging or diluting the voting rights of Richmond's black citizens. I believe that that finding, far from being clearly erroneous, was amply supported by the record below, and that the District Court properly denied the declaratory judgment sought by Richmond. I therefore dissent.

I

The Voting Rights Act of 1965 [1] grew out of a long and sorry history of resistance to the Fifteenth Amendment's ringing proscription of racial discrimination in voting. That history, which we reviewed in the course

---

[1] 79 Stat. 437, as amended, 84 Stat. 314, 42 U. S. C. § 1973 *et seq.*

of upholding the Act's constitutionality in *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308–315 (1966), showed a persistent and often ingenious use of tests and devices to disenfranchise black citizens.[2] Congress, in response, banned or restricted the use of many of the more familiar discriminatory devices;[3] but in addition, recognizing "that some of the States covered by § 4 (b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination . . . [and] that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself,"[4] Congress enacted the broad prophylactic rule of § 5 of the Act, prohibiting covered States from implementing any new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" without first securing the approval of either the Attorney General or the United States District Court for the District of Columbia. In an effort to avoid the delays and uncertainties fostered by prior statutes, under which affected parties or the Attorney General had been forced to assume the initiative in challenging discriminatory voting practices, Congress placed the burden of proof in a § 5 proceeding squarely upon the acting State or municipality to show that its proposed change is free of a racially discriminatory purpose or effect.[5] This burden is intended

---

[2] See also *Beer* v. *United States*, 374 F. Supp. 363, 377–378 (DC 1974); H. R. Rep. No. 439, 89th Cong., 1st Sess., 8–13 (1965); S. Rep. No. 162, pt. 3, 89th Cong., 1st Sess., 3–12 (1965).

[3] These devices included literacy tests, requirements of "good moral character," and voucher requirements, §§ 4 (a)–(d), 42 U. S. C. §§ 1973b (a)–(d), as well as poll taxes, § 10, 42 U. S. C. § 1973h.

[4] *South Carolina* v. *Katzenbach*, 383 U. S. 301, 335 (1966).

[5] *Georgia* v. *United States*, 411 U. S. 526, 538 (1973).

to be a substantial one for a State or locality with a history of past racial discrimination.[6]

In short, Congress, through the Voting Rights Act of 1965, imposed a stringent and comprehensive set of controls upon States falling within the Act's coverage. We have heretofore held that the language of § 5 was designed "to give the Act the broadest possible scope," and to require "that all changes, no matter how small, be subjected to § 5 scrutiny," *Allen* v. *State Board of Elections*, 393 U. S. 544, 567–568 (1969); we have thus applied § 5 to legislative reapportionments, annexations, and any other state actions which may potentially abridge or dilute voting rights. *Id.*, at 569–571; *Georgia* v. *United States*, 411 U. S. 526 (1973); *Perkins* v. *Matthews*, 400 U. S. 379 (1971).

The frontline judicial responsibility for interpreting and applying the substantive standards of § 5 rests exclusively with the United States District Court for the District of Columbia,[7] and the considerable experience which that court has acquired in dealing with § 5 cases enhances the respect to which its judgments are entitled on appellate review by virtue of that unique position. The District Court here recognized that it bears a "heavy responsibility" under § 5, and that that "responsibility is no less than to ensure realization of the Fifteenth Amendment's promise of equal participation in

---

[6] *City of Petersburg* v. *United States*, 354 F. Supp. 1021, 1027 (DC 1972), aff'd, 410 U. S. 962 (1973).

[7] We have consistently held that the substantive issue of discriminatory purpose or effect under § 5 can be litigated only in the District Court for the District of Columbia; the sole question open for consideration in any other district court is whether a state voting practice or requirement is of the sort required by § 5 to be submitted for prior approval. *Perkins* v. *Matthews*, 400 U. S. 379, 383–386 (1971); *Allen* v. *State Board of Elections*, 393 U. S. 544, 555–559 (1969); *Connor* v. *Waller*, 421 U. S. 656 (1975).

our electoral process." 376 F. Supp. 1344, 1346–1347 (1974). In exercising our power of appellate review over that court's substantive § 5 determinations, we must be equally devoted to that same majestic promise.

## II

In my view, the flagrantly discriminatory purpose with which Richmond hastily settled its Chesterfield County annexation suit in 1969 compelled the District Court to deny Richmond the declaratory judgment. The record is replete with statements by Richmond officials which prove beyond question that the predominant (if not the sole) motive and desire of the negotiators of the 1969 settlement was to acquire 44,000 additional white citizens for Richmond, in order to avert a transfer of political control to what was fast becoming a black-population majority.[8] The District Court's findings on this point were quite explicit:

> "Richmond's focus in the negotiations was upon the number of new white voters it could obtain by annexation; it expressed no interest in economic or geographic considerations such as tax revenues, vacant land, utilities, or schools. The mayor required assurances from Chesterfield County officials that at least 44,000 additional white citizens would be obtained by the City before he would agree upon settlement of the annexation suit. And the mayor and one of the city councilmen conditioned final acceptance of the settlement agreement on the annexation going into effect in sufficient time to make citizens in the annexed area eligible to vote in the City Council elections of 1970." [9]

---

[8] 376 F. Supp. 1344, 1349–1350 (DC 1974). The statements quoted, id., at 1349 n. 29, particularly those of then-Mayor Bagley, can hardly be described as subtle or indirect.

[9] Id., at 1350 (footnotes omitted).

Against this background, the settlement represented a clear victory for Richmond's entrenched white political establishment: the city realized a net gain of 44,000 white citizens, its black population was reduced from 52% to 42% of the total population, and the predominantly white Richmond Forward organization retained its 6–3 majority on the city council.

Having succeeded in this patently discriminatory enterprise, Richmond now argues that it can purge the taint of its impermissible purpose by dredging up supposed objective justifications for the annexation and by replacing its practice of at-large councilmanic elections with a ward-voting system. The implications of the proposed ward-voting system are discussed in Part III, *infra;* meanwhile, I have grave difficulty with the idea that the taint of an illegal purpose can, under § 5, be dispelled by the sort of *post hoc* rationalization which the city now offers.

The court below noted that Richmond, in initiating annexation proceedings in 1962, was motivated "by legitimate goals of urban expansion." 376 F. Supp., at 1351. By 1969, however, those legitimate goals had been pushed into the background by the unseemly haste of the white political establishment to protect and solidify its position of power. The District Court's findings quoted above fully establish that the 1969 settlement of Richmond's annexation suit was negotiated in an atmosphere totally devoid of any concern for economic or administrative issues; the city's own Boundary Expansion Coordinator was not even consulted about the financial or geographical implications of the so-called Horner-Bagley line until several weeks after the line had been drawn.[10] The contours of this particular annexation were shaped solely by racial and political considerations,

---

[10] 2 App. 352–354.

and the inference is not merely reasonable but indeed compelled that the annexation line would have been significantly different had the racial motivation not been present.[11]

To hold that an annexation agreement reached under such circumstances can be validated by objective economic justifications offered many years after the fact, in my view, wholly negates the prophylactic purpose of § 5.[12] The Court nevertheless, at the suggestion of the United States, remands for the taking of further evidence on the presence of any "objectively verifiable, legitimate reasons for the annexation." Even assuming, as the District Court did, that such reasons could now validate an originally illegal annexation, I cannot agree that a remand is necessary.

The District Court, adopting the findings of the Master whom it had appointed under Fed. Rule Civ. Proc. 53, squarely held that Richmond " 'has failed to establish any counterbalancing economic or administrative benefits of the annexation.' " 376 F. Supp., at 1353. The

---

[11] Several judges involved in a prior phase of this dispute have expressed a belief, founded upon the record, that Richmond would have secured far more favorable annexation terms had it not been prodded into a hasty settlement by the pendency of the 1970 elections. See *Holt* v. *City of Richmond,* 459 F. 2d 1093, 1108 (CA4) (Winter, J., dissenting), cert. denied, 408 U. S. 931 (1972); *Holt* v. *City of Richmond,* 334 F. Supp. 228, 236 (ED Va. 1971), rev'd on other grounds, 459 F. 2d 1093, *supra.*

[12] Had this agreement been properly submitted for § 5 clearance in 1969, I cannot believe that the annexation would ever have been permitted to take place. But our holding in *Perkins* v. *Matthews, supra,* that annexations fall within the scope of § 5, came more than a year after the Richmond annexation took effect; by this quirk of timing, the annexation escaped preimplementation scrutiny entirely. The 1969 line thus remains in place, a grim reminder in its contours and in its very existence of the discriminatory purpose which gave it birth.

record before the Master, including the entire record in *Holt* v. *City of Richmond*, 334 F. Supp. 228 (ED Va. 1971), rev'd, 459 F. 2d 1093 (CA4), cert. denied, 408 U. S. 931 (1972), to which the parties stipulated,[13] contained ample evidence on the economic and administrative consequences of the annexation. The Master and the District Court weighed this often conflicting evidence and found that Richmond had failed to carry its burden of proof by showing any legitimate purpose for the annexation as consummated in 1969.[14]

Federal Rule Civ. Proc. 52 (a) compels us to accept that finding unless it can be called clearly erroneous. I find it impossible, on this record, to attach that label to the findings below, and indeed, the Court never goes so far as to do so. Nevertheless, in apparent disagreement with the manner in which conflicting evidence was weighed and resolved by the lower court, the Court remands for further evidentiary proceedings, perhaps in hopes that a re-evaluation of the evidence will produce a more acceptable result. This course of action is to me wholly inconsistent with the proper role of an appellate court operating under the strictures of Rule 52 (a).

### III

The second prong of any § 5 inquiry is whether the voting change under consideration will have the effect of denying or abridging the right to vote on account of

---

[13] 376 F. Supp., at 1349.

[14] Much of the evidence in the record below appears to have dealt with Richmond's need for expansion and annexation in the abstract. Annexation in the abstract, however, is not at issue here; the critical question is whether the particular line drawn in 1969 had any contemporary justification in terms of objective factors such as Richmond's need for vacant land, an expanded tax base, and the like.

race or color. In *Perkins* v. *Matthews, supra,* holding that § 5 applies to annexations, we said:

"Clearly, revision of boundary lines has an effect on voting in two ways: (1) by including certain voters within the city and leaving others outside, it determines who may vote in the municipal election and who may not; (2) it dilutes the weight of the votes of the voters to whom the franchise was limited before the annexation, and 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.' *Reynolds* v. *Sims,* 377 U. S. 533, 555 (1964). Moreover, § 5 was designed to cover changes having a potential for racial discrimination in voting, and such potential inheres in a change in the composition of the electorate affected by an annexation." 400 U. S., at 388–389.

The guidelines of this discussion in *Perkins* were correctly applied by the District Court, which continued as follows:

"*Perkins* left implicit the obvious: If the proportion of blacks in the new citizenry from the annexed area is appreciably less than the proportion of blacks living within the city's old boundaries, and particularly if there is a history of racial bloc voting in the city, the voting power of black citizens as a class is diluted and thus abridged." 376 F. Supp., at 1348 (footnote omitted).

Measured against these standards, the dilutive effect of Richmond's annexation is clear, both as a matter of semantics and as a matter of political realities. Blacks constituted 52% of the preannexation population and 44.8% of the preannexation voting-age population in

Richmond, but now constitute only 42% of the postannexation population and only 37.3% of the postannexation voting-age population. I cannot agree that such a significant dilution of black voting strength can be remedied, for § 5 purposes, simply by allocating to blacks a reasonably proportionate share of voting power within the postannexation community.

The history of the Voting Rights Act, as set forth in Part I, *supra,* discloses the intent of Congress to impose a stringent system of controls upon changes in state voting practices in order to thwart even the most subtle attempts to dilute black voting rights. We have elsewhere described the Act as "an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws." [15] Congress was certainly aware of the hardships and inconvenience which § 5 and other portions of the Act could impose upon covered States and localities; but in passing the Act in its final form, Congress unmistakably declared that those hardships are outweighed by the need to ensure effective protection for black voting rights.

Today's decision seriously weakens the protection so emphatically accorded by the Act. Municipal politicians who are fearful of losing their political control to emerging black voting majorities are today placed on notice that their control can be made secure as long as they can find concentrations of white citizens into which to expand their municipal boundaries. Richmond's black population, having finally begun to approach an opportunity to elect responsive officials and to have a significant voice in the conduct of its municipal affairs, now finds its voting strength reduced by a plan which "guarantees"

---

[15] *Allen* v. *State Board of Elections,* 393 U. S., at 556 (footnote omitted).

four seats on the City Council but which makes the elusive fifth seat more remote than it was before. The Court would offer, as consolation, the fact that blacks will enjoy a fair share of the voting power available under a ward system operating within the boundaries of the postannexation community; but that same rationale would support a plan which added far greater concentrations of whites to the city and reduced black voting strength to the equivalent of three seats, two seats, or even fractions of a seat. The reliance upon postannexation fairness of representation is inconsistent with what I take to be the fundamental objective of § 5, namely, the protection of *present* levels of voting effectiveness for the black population.

It may be true, as the Court suggests, that this interpretation would effectively preclude some cities from undertaking desperately needed programs of expansion and annexation. Certainly there is nothing in § 5 which suggests that black voters could or should be given a disproportionately high share of the voting power in a postannexation community; where the racial composition of an annexed area is substantially different from that of the annexing area, it may well be impossible to protect preannexation black voting strength without invidiously diluting the voting strength of other racial groups in the community. I see no reason to assume that the "demographics" of the situation are such that this would be an insuperable problem for all or even most cities covered by the Act; but in any event, if there is to be a "municipal hardship" exception for annexations vis-à-vis § 5, that exception should originate with Congress and not with the courts.

At the very least, therefore, I would adopt the *Petersburg* standard relied upon by the District Court, namely, that the dilutive effect of an annexation of this sort can

be cured only by a ward plan " 'calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters.' " 376 F. Supp., at 1352.[16] The Crusade for Voters of Richmond, intervenor in the court below, submitted several plans providing for a greater black representation in the so-called "swing district" than that afforded by Richmond's own plan; the District Court, in light of these alternative submissions and in light of the fact that Richmond's ward plan had been drawn up without any reference to racial living patterns, concluded that Richmond's plan did not, "to the extent possible," minimize dilution of black voting power. *Id.,* at 1356–1357. On that basis, I would affirm the finding that Richmond failed to establish the absence of a discriminatory effect prohibited by § 5.

## IV

More than five years have elapsed since the last municipal elections were held in Richmond.[17] Hopes which were lifted by the District Court decision over a year ago are today again dashed, as the case is remanded for what may prove to be several additional years of litigation; Richmond will continue to be governed, as it has been for the last five years, by a slate of councilmen elected in clear violation of § 5.[18] The black population of Richmond may be justifiably suspicious of the "pro-

[16] The original version of this standard appears in *City of Petersburg* v. *United States,* 354 F. Supp., at 1031.

[17] The last councilmanic election was held on June 10, 1970. 1 App. 71; 376 F. Supp., at 1351.

[18] The 1970 elections were conducted on an at-large basis in the postannexation community, a procedure inconsistent with even the narrowed *Petersburg* "effect" test adopted by the Court today. Moreover, since the elections occurred prior to our decision in *Perkins, supra,* there was no attempt to submit the annexation for prior approval. Section 5 is violated in both respects.

tection" its voting rights are receiving when these rights can be suspended in limbo, and the people deprived of the right to select their local officials in an election meeting constitutional and statutory standards, for so many years. I would affirm the judgment below, and let the United States District Court for the Eastern District of Virginia set about the business of fashioning an appropriate remedy as expeditiously as possible.