COUNTY COUNCIL OF SUMTER COUNTY, SOUTH CAROLINA, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants,

Larry Blanding, et al., Defendants-Intervenors.

Civ. A. No. 82–0912.

United States District Court, District of Columbia.

May 25, 1984.

---

1. Judge Pettine specifically retained jurisdiction in *Palmigiano v. Garrahy*, 443 F.Supp. 956, 990 (D.R.I.1977).

**36**

Joseph W. Dorn, Kilpatrick & Cody, Washington, D.C., Terrell Glenn, M. Elizabeth Crum, McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, P.A., Columbia, S.C., Howard P. King, Bryan, Bahnmuller, King, Goldman & McElveen, Sumter, S.C., for plaintiffs.

Gerald W. Jones, Paul F. Hancock, J. Gerald Hebert, Thomas G. Snow, Attys., Civ. Rights Div., Dept. of Justice, Washington, D.C., for defendants.

Armand Derfner, Washington, D.C., Laughlin McDonald, Atlanta, Ga., Herbert Buhl, II, Columbia, S.C., for defendants-intervenors.

Before BORK, Circuit Judge, and PARKER and OBERDORFER, District Judges.

PER CURIAM:

We are concerned that because this and related proceedings have been so protracted and, more recently, because of the "exigencies of judicial deliberation," *Beer v. United States,* 374 F.Supp. 357, 360 (D.D.C.1974), elections have not been held in Sumter County for some time. Although this court is not yet ready to issue its full opinion and findings of fact, we have agreed upon a disposition. Rather than permit the current situation to continue, with no elections being held, we have decided to issue an order stating our agreed disposition, with opinions and findings to follow.

We conclude that plaintiffs have failed to carry their burden of proof under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1982), and have failed to prove that Act 371, 1967 S.C. Acts 371 ("Act 371"), as amended and supplemented, has neither the purpose nor effect of denying or abridging the right of black South Carolinians to vote.

The Supreme Court has said: "The fact that a covered jurisdiction adopted a new election practice after the effective date of the Voting Rights Act raises, in effect, a statutory inference that the practice may have been adopted for a discriminatory purpose or may have a discriminatory effect." *McCain v. Lybrand,* — U.S. —, 104 S.Ct. 1037, 1049–50, 79 L.Ed.2d 271 (1984). Plaintiffs have failed to rebut the inferences that can be drawn from the following facts. Their application for a declaratory judgment must therefore be denied.

*Summary Findings of Fact*

1. South Carolina is a covered jurisdiction under the Voting Rights Act. The State has a history of segregation and pervasive racial discrimination which has been an important factor in detrimentally affecting the political participation of black South Carolinians. Until after the passage of the Voting Rights Act, South Carolina enacted and enforced a variety of laws that had the purpose and effect of denying the right to vote to its black citizens.

2. In 1980, Sumter County blacks constituted 44.1 percent of the population, 41.3 percent of the voting age population, and 42.1 percent of the registered voters.

3. Racial segregation was, and in large measure remains, the way of life in much of the private sector of Sumter County. Voting in Sumter County is racially polarized.

4. Before Act 371 was passed in 1967, members of the Sumter County Board of Commissioners, the County's governing body, were appointed by the Governor on recommendation of the local delegation to the State General Assembly (the "Legislative Delegation"). This Legislative Delegation *de facto* governed Sumter County, although the General Assembly of South Carolina possessed the *de jure* authority to enact local laws for Sumter County and the Governor had the *de jure* authority to veto all such legislation. Both the Governor and the Legislative Delegation were elected at-large.

5. Prior to 1967, the Governor followed the Legislative Delegation's recommendations concerning appointments to the County governing body. As long as this appointive system was in effect, no black person was appointed to Sumter County's Board of Commissioners.

6. In mid-1967, the Governor began appointing blacks to various offices.

7. During 1966–67, the South Carolina Senate was compelled to alter its apportionment system after its apportionment was held to violate the fourteenth amendment. This created the possibility that a black senate district would be created and the person elected from that district might control appointments to the Sumter County governing body.

8. In 1967, the South Carolina legislature passed Act 371. Act 371, which was formulated without significant input from Sumter County's black community, creates a seven-member Sumter County Council. Under Act 371, each Council member is elected at-large. The winners are determined by majority vote and voting is with-out regard to geographic location of residency. Thus, under this Act, the citizens of Sumter County—a majority of whom are white—elect all of the Council members.

9. Since the adoption and implementation in 1967 of the at-large system, only one black person (Phillip Rembert in 1974) has been elected to the Sumter County governing body.

10. There are three gubernatorially appointed boards in Sumter County; each has more than one black. Although the number of persons representing the black community who would be appointed by the Governor today if that system were in place is to a degree speculative, appointments by race to these boards is probative.

11. Regardless of the relative merits of comparing the appointive system with the at-large system, a fairly drawn single-member district election plan would give black voters of Sumter County a better opportunity to elect candidates of their choice to the Sumter County Council than the at-large system does. A fairly drawn single-member district plan for the Sumter County Council is more likely to allow black citizens to elect candidates of their choice in three of seven districts (or 42.8 percent of the representation on the Council).

12. Act 371 was not submitted to the Attorney General for preclearance pursuant to the Voting Rights Act. Thus, the at-large elections for the Sumter County Council held in 1968, 1970, 1972, 1974 and 1976 were in violation of section 5 of the Voting Rights Act.

13. In 1975, the South Carolina legislature passed the Home Rule Act, which permitted each of South Carolina's counties to hold a referendum to select one of five alternate forms of local government, and to decide whether county governors would be elected at-large or from single-member districts. The Sumter County Council did not call for a referendum, thus preserving the council administrator system derived from Act 371.

14. The reason the members of Sumter County Council gave for refusing to hold

the referendum, despite the objections of, among others, the Sumter County League of Women Voters, the Sumter County Republican Party, and the only black councilman, was "that they knew more or less what was best for the community." Plaintiffs have not effectively rebutted evidence that racial considerations influenced the Council's decision not to hold a referendum.

15. The white members of the Sumter County Council have at all times taken public positions favoring at-large elections. In an advisory referendum held in November 1978 on at-large elections, all the organizations in Sumter County that took a position on the referendum question favored single-member districts. The white councilmen continued to favor at-large districts and issued a position paper warning against "fragment[ing] county government into special interest groups." The white councilmembers also secretly prepared a full-page advertisement endorsing at-large elections which appeared in the *Sumter Daily Item* on the eve of the referendum. Plaintiffs have not effectively rebutted evidence that the advertisement was intended to make clear that the referendum question (at-large versus single-member districts) was essentially a racial one.

16. In the referendum election, the at-large system was preferred by the slight majority of 787 votes out of approximately 12,700 votes cast. Whites are estimated to have voted for at-large elections by a four to one margin; blacks are estimated to have voted nine to one against at-large elections.

17. Plaintiffs have failed to carry their burden of proving that the legislature did not pass Act 371 in 1967 for a racially discriminatory purpose at the insistence of the white majority in Sumter County, because the at-large method of voting may have diluted the value of the then-increasing voting strength of the black minority, may have prevented formation of a black majority senate district, and probably prevented appointment by the Governor of blacks to the Sumter County Council.

18. Plaintiffs have failed to carry their burden of proving that the at-large system was not maintained after 1967 for racially discriminatory purposes and with racially discriminatory effect.

### Conclusions of Law

1. Although it may seem anomalous to some to apply a statute prohibiting any actions denying or abridging the "right to vote" where an appointive system has been replaced by an elective one, we are convinced that section 5 of the Voting Rights Act does apply to this case. We reach that conclusion for two reasons. First, the Supreme Court has strongly implied in *Blanding v. DuBose*, 454 U.S. 393, 102 S.Ct. 715, 70 L.Ed.2d 576 (1982), that the Voting Rights Act applies *to this case*. Second, in *McCain v. Lybrand*, —— U.S. ——, 104 S.Ct. 1037, 79 L.Ed.2d 271 (1984), the Supreme Court applied the Voting Rights Act in a case like this, where an appointive system was replaced by an elective system. Also, in that decision the Supreme Court defined section 5 of the Voting Rights Act to cover "any election practices different from those in effect on November 1, 1964." *McCain v. Lybrand*, 104 S.Ct. at 1044.

2. In *Blanding v. DuBose*, the Supreme Court held that a letter the South Carolina Attorney General sent to the United States Justice Department reporting that the 1978 referendum had approved at-large council elections for Sumter County did not constitute a request for preclearance. The Supreme Court viewed the 1979 letter as a request for reconsideration. Thus, the Court held that the Attorney General's failure to respond within 60 days as required by the Act did not constitute preclearance of the change by default. If the Voting Rights Act does not apply to Sumter County's change to at-large council elections, the Supreme Court need not have decided whether the 1979 letter was a request for preclearance: preclearance would not be necessary.

3. In *McCain v. Lybrand*, the Supreme Court accepted a stipulation that an Act which replaced a Board of County Commis-

sioners that had two appointed members with a three-member County Council elected at-large was required to be submitted for preclearance. 104 S.Ct. at 1046 n. 17. The Court could not have accepted such a stipulation had the Voting Rights Act not applied, as the Act's applicability goes to the Court's subject matter jurisdiction, and parties cannot waive a defect in subject matter jurisdiction. Moreover, in *McCain* the Court expressly and repeatedly defined section 5 of the Voting Rights Act as follows:

> Section 5 of the Voting Rights Act of 1965 ... required a covered State or political subdivision desiring to implement any election practices different from those in effect on November 1, 1964 to obtain a declaratory judgment from a three-judge panel of the United States District Court for the District of Columbia holding that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" before the new practice could be implemented.

*McCain v. Lybrand,* 104 S.Ct. at 1044. It is beyond question that the change here is an election practice different from that in effect on November 1, 1964.

4. In order to rebut the inference of discriminatory effect, plaintiffs here were required to prove that the at-large election system in Sumter County will not "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976). They have not done this. Neither have they carried the heavy burden they bear as to the purpose of this change. Plaintiffs are required to demonstrate the absence of discriminatory purpose; and section 5 preclearance must be denied if the evidence fails to disprove that a discriminatory purpose was present as a motivating factor among other legitimate non-discriminatory ones. *City of Richmond v. United States,* 422 U.S. 358, 378, 95 S.Ct. 2296, 2307, 45 L.Ed.2d 245 (1975). The evidence plaintiffs have adduced does not do this.

5. Since we find that section 5 of the Voting Rights Act applies, and that plaintiffs have failed to prove that the proposed change is not retrogressive, we need not reach the section 2 issues in this case.

6. Defendant-intervenors have moved that this court order interim elections pending our decision on the merits of plaintiffs' case. They ask that we divide the County into seven single-member districts and that we modify the election schedule to allow for implementation of this interim plan. This motion is mooted by the order we issue today unless this order is stayed by the Supreme Court. There will be time enough to address the need for emergency relief if such a stay is granted. We therefore deny defendant-intervenors' motion for interim elections.

Nothing we say or do in this memorandum or the accompanying order is intended to preclude any party from seeking in another jurisdiction the relief sought by the emergency motion filed here by defendant-intervenors.