# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-AN-01547-SCT

*IN THE MATTER OF THE EXTENSION OF THE*
*BOUNDARIES OF THE CITY OF LAUREL,*
*MISSISSIPPI: CITY OF LAUREL, MISSISSIPPI*

*v.*

*SHARON WATERWORKS ASSOCIATION, SHADY*
*GROVE UTILITY DISTRICT, SHADY GROVE*
*WATER ASSOCIATION, OTHER OBJECTORS*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/06/2007 |
| TRIAL JUDGE: | HON. CHARLES D. THOMAS |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JERRY L. MILLS |
| | WILLIAM S. MULLINS, III |
| | NORMAN GENE HORTMAN |
| ATTORNEYS FOR APPELLEES: | JOSEPH EDGAR FILLINGAME |
| | TIM HANCOCK |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 01/15/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

### FACTS AND STATEMENT OF THE CASE

¶1.     On June 18, 1997, the City of Laurel ("the City") filed with the Chancery Court of Jones County a complaint in the nature of a petition to ratify and confirm the extension of its boundaries. The City proposed to annex three parcels of land ("the PAA"): 1. the Southern

Parcel (a/k/a the Pendorff area); 2. the Western Parcel (a/k/a the Sports Complex area); and 3. the Northern Parcel (a/k/a the Shady Grove area and the Sharon area). The Shady Grove Utility District filed a Motion to Dismiss the annexation petition stating the petition was improper as it split the utility district in violation of legislative prohibition.

¶2.     The Honorable R.B. Reeves, Jr., senior status judge appointed as Special Chancellor, issued a decision. *City of Laurel v. Sharon Waterworks Ass'n,* 918 So. 2d 1269, 1270 (Miss. 2005). In his decision, the chancellor stated that the City had not properly complied with Section 12 of House Bill 1730, 1996 Miss. Local & Private Laws, ch. 970 (House Bill 1730) which required that either all or none of the land in a district be annexed,[1] and gave the City twenty days in which to comply with House Bill 1730. *City of Laurel,* 918 So. 2d at 1270. Subsequently, the City filed an Amended Complaint in which it added a remaining portion of the Shady Grove Utility District which was located in the Northern Parcel. *Id.* at 1270-71. The area sought to be annexed expanded from ten point nine square miles to seventeen square miles.

¶3.     Thereafter, the case came on for hearing.  On March 20, 2002, Chancellor Reeves issued an opinion in which he found the annexation of only the Pendorff area in the Southern Parcel to be reasonable. *Id.* at 1271. On May 30, 2003, a final judgment was issued wherein

---

[1]The pertinent portion of House Bill 1730 states:
None of the territory lying within the district shall be subject to an annexation by any city, town or village *unless all of the territory of the district is annexed*, in which event the city, town or village shall assume the operation and maintenance of the facilities of the district with respect to the payment of any outstanding bonds of the district and all other contractual obligations of the district.
(Emphasis added)

the enlargement and extension of the boundaries of the City was approved as to the Pendorff area only. *Id.*

¶4.    The City filed an appeal asserting the following issues:

I.    Whether the provision of House Bill 1730 violates Article 4, Section 88 of the Mississippi Constitution of 1890.[2]

II.    Whether the Chancellor was manifestly wrong in limiting the annexation of the City to the Pendorff area.

*Id.*

¶5.    This Court found that the chancellor's ruling

did not set out a clear basis explaining why a particular parcel should or should not be annexed. A few of the indicia of reasonableness do have sufficient information, but as a whole, there is not enough information concerning the twelve indicia of reasonableness to make an informed determination. Therefore, this Court does not have enough information to determine whether the chancellor's reasoning and rulings as to the parcels provides substantial evidence that the annexation should be either granted or denied.

*Id.* The trial court further did not issue a ruling on whether House Bill 1730 was constitutional, therefore, this Court did not consider the issue on appeal. *Id.* at 1272. This Court vacated the chancellor's ruling and remanded the case so he could clarify his findings. *Id.* at 1271.

¶6.    After remand, Judge Reeves recused due to health reasons. Senior Status Judge Charles D. Thomas was then appointed special chancellor for the case. Chancellor Thomas reviewed the record and required the parties to submit briefs.

---

[2]A notice of claim of unconstitutionality of a certain local and private act was provided by the City to the Attorney General of Mississippi. The Attorney General filed a Notice of Intervention to defend the constitutionality of relevant statutes and joinder. *City of Laurel v. Sharon Waterworks Ass'n,* 918 So. 2d 1269, 1270 n. 1 (Miss. 2005).

3

¶7. In a written opinion, Chancellor Thomas addressed the twelve indicia of reasonableness as established by this Court in *In Re Extension of the Boundaries of City of Ridgeland v. City of Ridgeland,* 651 So. 2d 548, 550 (Miss. 1995). The chancellor found that it was reasonable for the Pendorff area (the Southern Parcel) and the Sports Complex area (the Western Parcel) to be annexed. After weighing all factors, the chancellor held that it was unreasonable for the Shady Grove and Sharon areas (the Northern Parcel) to be annexed.

¶8. The chancellor further found that House Bill 1730 is not violative of Section 88 of the Mississippi Constitution of 1890 as "[a]nnexation is a legislative affair." *The Matter of the Boundaries of the City of Jackson*, 551 So. 2d 861, 863 (Miss. 1989). In his lengthy analysis, the chancellor additionally found that "[a]lthough general legislation authorizes the creation of utility districts, it has been held that the creation of such a district through local and private legislation does not violate Section 88." *See In re Validation of Utility District Revenue Board v. Gautier Utility District,* 456 So. 2d 1003 (Miss. 1985).

¶9. The City subsequently filed a Motion to Alter or Amend the Judgment. A hearing was held on this motion, and both parties presented brief arguments. The chancellor denied the motion on all substantive issues and required the judgment to be altered, to include the legal descriptions of each parcel authorized to be annexed.

¶10. The City of Laurel then appealed to this Court, presenting the following issues:

I. Whether the Chancellor erred in finding that the Legislative action contained in House Bill 1730 does not violate Article 4, Section 88 of the Mississippi Constitution of 1890.

4

II. Whether the Chancellor's finding was manifestly wrong and without credible evidence that it was not reasonable to allow the City to annex the Northern Parcel.

## STANDARD OF REVIEW

¶11. In annexation matters, "[t]his Court's standard of review is very limited. The Court can only reverse the Chancery Court's findings as to the reasonableness of an annexation if the chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence." *In re Enlargement & Extension of the Municipal Boundaries v. City of Biloxi*, 744 So. 2d 270, 276 (Miss. 1999). "The burden of proving the reasonableness of the annexation is on the party asserting the annexation." *Id.* at 277.

## ANALYSIS

I. **Whether the provision of House Bill 1730 violates Article 4, Section 88 of the Mississippi Constitution of 1890.**

¶12. The City submits to this Court that the chancellor erred in finding that House Bill 1730 was not violative of Article 4, Section 88 of the Mississippi Constitution of 1890, which provides:

> The Legislature shall pass general laws, under which local and private interest shall be provided for and protected, and under which cities and towns may be chartered and their charters amended, and under which corporations may be created, organized, and their acts of incorporation altered; and all such laws shall be subject to repeal or amendment.

¶13. The City contends that House Bill 1730 contains a "poison pill" provision that requires all or none of the Shady Grove utility district to be annexed. The City submits that this provision imposes a condition on annexation which is in violation of Section 88 of the Mississippi Constitution. Without citation to authority, the City states that "general

5

legislation is required on the subject of annexation." However, the language of Article 4, Section 90 of the Mississippi Constitution does not support such a proposition, as it reads, "[t]he Legislature shall not pass local, private, or special laws in any of the following enumerated cases, but such matters shall be provided for only by general laws," and lists twenty-one instances in which general laws are required. None of these cases include annexation. *See* Miss. Const. Art. 4, § 90 (1890).

¶14.    The City further argues that the provision of House Bill 1730 is an "attempt to prevent the chancellor from exercising his statutory and constitutional authority to deny the portion of the annexation that he deems unreasonable." The City asserts that the chancellor committed manifest error because once it was determined that House Bill 1730 required the all or nothing approach, he ignored 2.2 miles of the Shady Grove area that was not in the Shady Grove Utility District.[3] The City asserts this 2.2 square mile area should have been considered separately and that consideration of this area separately would have led to the conclusion that the annexation was reasonable.

¶15.    The Shady Grove objectors submit that House Bill 1730 simply recognized the need to maintain the financial integrity of the legislatively approved utility district "in view of the uncertainty of the viability of the portion which would not be annexed." Shady Grove argues that the Legislature did provide a means for annexation of the Shady Grove Utility District.

---

[3]Subsequent to the final judgment being issued, a hearing was had before Chancellor Thomas on the City's Motion to Alter or Amend Judgment. The objectors argued that the City was "coming in after the fact trying to isolate a certain area," as this 2.2 square mile area was not specifically addressed in the original action. The City's response was that it "did not isolate" the area, but "provided the court information that would allow [the court] to exercise its option of decreasing the territory."

6

Additionally, Shady Grove submits that the Legislature also understood that if only part of the district were to be annexed, "the entire district could be placed in a situation in which it is no longer viable or sustainable."

¶16.    Shady Grove finally asserts that, "[l]egislative acts are, however, cloaked with a presumption of constitutionality, and unconstitutionality must appear beyond reasonable doubt." *City of Belmont v. Miss. State Tax Comm'n*, 860 So. 2d 289, 307 (Miss. 2003) (citations omitted).

¶17.    This Court has held that "[a]nnexation is a legislative affair." *In Re Enlargement and Extension of the Mun. Boundaries of Biloxi,* 744 So. 2d 270, 277 (Miss. 1999). Further, this Court has ruled,

> The contention that the constitution of 1890 in any manner abridged or limited the power of the legislature in reference to municipal corporations is based upon a total misconception of the real meaning and design of that instrument. Munnicipal [sic] corporations are now, as they have always been in this state, purely creatures of legislative will; governed, and the extent of their powers limited, by express grants; invested, for purposes of public convenience, with certain expressed delegations of governmental power; their granted powers subject at all times to be enlarged or diminished; having no vested rights in their charters which are subject at all times to amendment, modification, or repeal; their powers, their rights, their corporate existence, dependent entirely upon legislative discretion, acting as it may deem best for the public good. This conclusion has been so repeatedly announced by our own courts, and has been so uniformly approved by text-writers, and decided by courts of last resort in other states, that it has become crystallized into settled law, and now receives recognition as a universally accepted rule of constitutional construction. . . .

*Adams v. Kuykendall*, 83 Miss. 571, 590, 35 So. 830, 834 (1904). The *Adams* Court also held, "[w]e adhere to the time-honored and firmly established doctrine that all municipalities are within legislative control, and that sec. 88 placed no limitation on that power." *Id.* at 593.

7

¶18.   The Court also addressed this issue in ***In Re Validation of $7,800,000 Combined Utility System Revenue Bond v. Gautier Utility District,*** 465 So. 2d 1003 (Miss. 1985). Objectors in ***Gautier Utility District*** argued the district lacked authority to issue bonds and that the local and private acts creating the authority to do such were violative of the Mississippi Constitution. ***Id.*** at 1015. Quoting ***Harris v. Harrison County Board of Supervisors,*** 366 So. 2d 651, 654 (Miss. 1979), the ***Gautier Utility District*** Court stated,

> Although general laws are preferred over private laws, the function of deciding the wisdom and propriety of enacting special laws is in the legislature and not in the courts, and courts will not refuse to enforce such [private] laws merely because it may be felt that a general law would have been more suitable.

***Gautier Util. Dist.,*** 465 So. 2d at 1016.

¶19.   The Court further held, "[t]his idea of legislative authority emanates from Article IV, Section 89 which sets forth the procedure for enactment of a local and private act. When the legislature has complied with those requisites, the courts shall not, because of its local, special, or private nature, refuse to enforce it, unless it contravenes Section 90." ***Gautier Util. Dist.,*** 465 So. 2d at 1016. As explained *supra*, the chancellor's ruling does not contravene the mandate of Section 90 of the Mississippi Constitution.

¶20.   The chancellor's finding comports with the law in holding that "[u]nder our constitutional scheme, there is no prohibition upon the Legislature's enacting upon a given subject matter by both a general law and a local and private law." ***Id.*** Based on the foregoing reasons, we find no fault with the chancellor's finding that "[i]t is clearly within the Legislature's power to protect the vitality of the Shady Grove Utility District by including the language in Section 12 [of House Bill 1730] that states that the district may not be

8

annexed unless in its entirety. Section 12 of House Bill 1730 does not offend the mandate of Article IV, Section 88 of the Mississippi Constitution, and neither is it at odds with the general laws regarding annexation."

**II.    Whether the chancellor's finding that it was not reasonable to allow the City to annex the Northern Parcel was manifestly wrong and without credible evidence.**

¶21.    "This Court has set forth a list of factors or so called indicia of reasonableness to guide the chancellor in his determination of the reasonableness of a city's annexation request. The Court first enumerated these factors in *Dodd v. City of Jackson*, 238 Miss. 372, 396-97, 118 So. 2d 319, 330 (1960), and in later decisions has expanded the list." *In re Enlargement & Extension of the Municipal Boundaries v. City of Biloxi*, 744 So. 2d 270, 276 (Miss. 1999). The Court has stated, "'[t]hese factors, however, are only indicia of reasonableness, not separate and distinct tests in and of themselves.' *Bassett v. Town of Taylorsville*, 542 So. 2d 918, 921 (Miss. 1989). The chancellor must consider all of these factors and determine whether under the totality of the circumstances the annexation is reasonable." *City of Biloxi*, 744 So. 2d at 276. The chancellor appropriately considered the twelve indicia of reasonableness as it pertained to the four areas sought to be annexed. We examine each indicia of reasonableness as it applies to the areas at issue, the Sharon area and the Shady Grove area.

1)    **The Need to Expand**

       **a) spillover growth**

¶22.    The chancellor found that the testimony of Michael Slaughter, who was accepted as an expert in the field of urban regional planning and civil engineering, that the factor of

9

spillover growth weighed in favor of the City regarding the Shady Grove parcel, but not the Sharon parcel.

¶23. Regarding the Sharon parcel, former Laurel Mayor Susan Vincent testified that there was not much development in the Sharon parcel. Mayor Vincent further testified that the commercial areas along 5th Avenue heading north out of the city of Laurel to Sharon Road have been vacant for years. Slaughter testified that there were only two businesses in the Sharon parcel that would generate tax revenue for the city. Slaughter and Mayor Vincent also testified that no one from the Sharon parcel-- developers or otherwise-- had asked to be annexed in order to receive the benefit of City services and that no organized subdivisions existed in the Sharon parcel. The chancellor stated that "the absence of any subdivision within the Sharon parcel calls into question the city of Laurel's claims of spillover growth."

¶24. Aside from quoting the opinion of the chancellor, and stating that the chancellor did not address the 2.2 square mile area outside of the Shady Grove Utility District, the City did not address the spillover findings by the chancellor.

¶25. The findings of the chancellor were supported by substantial and credible evidence.

**b) internal growth**

¶26. The chancellor found that "the City's growth is within its downtown area, and it is reasonable that its focus should be there." Shady Grove's expert, Joe Lusteck, testified that based upon his personal inspections, the City did not have a need to expand to accommodate any additional housing or population growth and there was no need for territorial expansion by the City.

¶27. Sharon's expert in municipal planning, Jim Elliot, testified "there are several big buildings that are vacant. . . . I would say in terms of commercial property, the City has no need to expand for commercial, retail, residential property."

¶28. The chancellor found, contrary to the City's argument, that 27.6 percent of the land within the City was not developed and that there are many businesses within the City which have boarded up and closed.

¶29. The City presents no argument regarding the internal growth factor.

¶30. We hold that the findings by the chancellor on the internal growth factor were supported by substantial and credible evidence.

### c) population growth

¶31. The chancellor found, and all parties agree, that the City has experienced a continual decline in population over the last forty years. The chancellor found that this decrease in population weighs against annexation. The City's counter argument was that the population decline has *slowed* over the past decade.

¶32. The chancellor found that: a) the amount of construction of new residential units within the City did not justify a need for expansion; b) that the median age of the City's residents has increased from 26.9 to 34.9; c) that the median age of the citizens is not significantly different at 33.6; d) that there was an increase in the number of citizens over fifty and beyond child-bearing age; and e) that a loss of jobs in the City had affected the population.

¶33. Substantial and credible evidence supports the chancellor's finding that this factor does not support the need for annexation.

11

### d) The City's need for development land

¶34. The chancellor cited Slaughter's testimony that the PAA (approximately seventeen square miles) is larger than the existing size of the City (about sixteen square miles). The chancellor further cited Slaughter's testimony that the City was not "choked down" and that he believed "there was a need to expand from within." However, Slaughter did not prepare a land use analysis showing how much each of the areas proposed for annexation was needed, nor did he calculate the rate of consumption of land within the City. The chancellor also considered the testimony of Sharon's expert, Jim Elliot, who testified that there was more than 150 acres of vacant land suitable for commercial development.

¶35. The City argues its level of build out constitutes a need for expansion, and that the City is 72.4 percent developed. The City acknowledged "there is no magic build out number, and Joseph Lusteck, an urban planner hired by the objectors has consistently testified that 'a city should generally be looking at expansion when it is two-thirds built out, and to expanding when it is three-fourths built out," as recognized by this Court in *City of Jackson v. City of Ridgeland (In re Extension of the Boundaries of Ridgeland),* 651 So. 2d 548, 556 (Miss. 1995).

¶36. The City further claims the case sub judice is analogous to this Court's decision in *In Re Extension of Boundaries of City of Winona,* 879 So. 2d 966, 977 (Miss. 2004). However, in *Winona,* this Court affirmed the chancellor's decision based on the following factors: "that spillover growth occurred in the 'Winona Elevator Property,' each parcel of land was immediately adjacent to the City, each piece of property is "prime for commercial

development," and that each parcel of land is in the path of growth of the City." ***Id.*** However, substantial and credible evidence of these factors is not found in this case.

¶37.   Substantial and credible evidence supports the chancellor's finding that this factor does not support annexation:

> Most annexations involve a growth component with significant demand for real estate to accommodate either new population or new economic growth, neither of which is present in this attempt at annexation. The City of Laurel has experienced decline and continues to experience some decline, and the evidence indicates an alternative strategy for redevelopment is available to the City by taking what is no longer being used and put to its highest potential use.

### e) The need for planning in the annexation area

¶38.   The chancellor's opinion recognizes that this Court considers a variety of factors when addressing the need for planning and that this Court has both approved and disapproved of municipalities which provide no zoning. There was evidence submitted that there is no zoning in unincorporated Jones County, but the City has standard building and housing codes, a comprehensive plan, and zoning ordinances to direct and guide growth.

¶39.   The chancellor, in detailing the need for planning in each parcel, called specific attention to the City's lack of argument regarding the need for planning in the 2.2 square miles of the Shady Grove parcel or in the Sharon parcel. Similarly, the City presents no argument to this Court regarding the need for planning in the entire Shady Grove parcel nor the Sharon parcel. The chancellor found this factor weighed against the need for annexation in these two parcels and the City offered no evidence or legal authority in opposition thereto.

### f) Increased traffic counts

13

¶40.    The chancellor, based on the testimony of Slaughter and Mayor Vincent, found that traffic counts were increased in the Pendorff and Western parcels only. Regarding the northern portion of the Shady Grove area, the chancellor found the traffic count was less than half that of the Western parcel. The chancellor further found that based on Slaughter's data, the Sharon parcel had the least traffic. Mayor Vincent also testified similarly.

¶41.    The City states that traffic count increases were not limited to the Western parcel and the Pendorff area, but provided no evidentiary data to support this position.

¶42.    Because the City provided no evidence that traffic counts had increased in the Shady Grove or Sharon area, the chancellor found that this factor did not weigh in favor of annexation.

### g) Need to maintain and expand the City's tax base

¶43.    The chancellor found that due to Laurel's position as the economic hub of Jones County and because of the spillover growth into the Pendorff, Western and original Shady Grove parcels, that this factor favored annexation into those three areas.

¶44.    Shady Grove provides little argument in response to this factor except to state that Slaughter testified that the City does not need to annex to maintain its financial viability.

¶45.    The Sharon objectors concur with the chancellor's finding that their area should not be annexed. The Sharon objectors state that, of 150 businesses in the PAA, only two of them are in the Sharon area.

¶46.    Substantial and credible evidence supports the chancellor's findings.

14

**h) Limitations due to geography and surrounding cities**

¶47.    The chancellor found, based on an exhibit we are not provided with,

> that the City is locked in by flood plains on its east boundary and on its west boundary. These surrounding areas could be developed, but at an increased cost; therefore these areas are less desirable. This leaves the City, if it is to expand, to go to the north or south, and to a limited extent to the west within the Western parcel. . . . This factor favors the city of Laurel's need to expand into all of the particular parcels in this case.

The Sharon objectors provided no argument challenging that finding.

¶48.    The chancellor further found there are a lack of streets connecting the City to the Shady Grove parcel and that there was evidence showing the City did not plan on developing any streets in the Shady Grove parcel. In the City's plan for Phase I and Phase II, it stated it would improve *existing* streets. The chancellor found that this "weakened" the effect of reasonableness as to the Shady Grove parcel.

¶49.    We find no error in the chancellor's finding that this factor favored annexation of the Sharon parcel. However, we find the chancellor erred regarding this factor supporting the annexation of the Shady Grove parcel, based on the chancellor's own recognition of a lack of connecting streets and no evidence that any will be built by the City. This Court has found that "interconnection by transportation corridors" is a factor when determining reasonableness. *In re Enlarging, Extending & Defining the Corporate Limits & Boundaries of the City of Meridian*, 992 So. 2d 1113, 1118 (Miss. 2008).

**i) Remaining vacant land within the municipality**

15

¶50. As to this factor, the chancellor cited his observations regarding the "need for development of land" and "internal growth" factors. The chancellor also stated that the demolition of 400 dwelling units caused an increase in vacant lots. However, Mayor Vincent testified that "because there is no excess of property, we're having to tear down old buildings to find places to build the new ones.

¶51. The chancellor additionally cited testimony that several apartment complexes have been constructed in the City and "that apartment complexes house more people within a smaller footprint than individual housing units."

¶52. The City provides no argument in response to these findings.

### j) Environmental influences

¶53. The chancellor found this factor did not weigh in favor of annexation, as the City offered no evidence as to this factor. Likewise, the City makes no argument to this Court that the chancellor erred as to this factor.

### k) The City's need to exercise control over the PAA

¶54. For this factor, the chancellor adopted his discussion of factor (e), the need for planning. Only the Sharon objectors address this issue, arguing that this factor is one-sided, as there is never any mention of the unincorporated area of the *county's* need to exercise control over the PAA.

### i) Increased new building permit activity

16

¶55.    The chancellor cited Slaughter's testimony, as well an exhibit which this Court was provided, supporting a steady trend for new residential and commercial construction in the City. However, the chancellor went on to state that this factor only *weakly* supports annexation into each of the parcels as Slaughter testified some of these permits could have been issued for decks, patios, additions, carports or storage sheds.

¶56.    Neither the City of Laurel, nor Shady Grove, provide argument or evidence regarding this factor. The Sharon objectors argue that by stating the factor *weakly* supports annexation, that this factor does not support annexation. Furthermore, the Sharon objectors point out that the number of businesses in Laurel has decreased by 313.

¶57.    Although the evidence presented regarding this factor is limited, it supports the chancellor's limited finding.

*Conclusion of factors regarding the need for expansion:*

¶58.    The chancellor conducted a thorough analysis of each of the required factors and held that the foregoing factors did not support of the City's need for expansion. His analysis was supported by substantial and credible evidence, therefore, we are constrained to find no reversible error in his decision.

**2)    The Path of Growth**

¶59.    The chancellor relied on his findings in "spillover growth" and "limitations due to geography and surrounding cities." The chancellor found annexation was reasonable as to the Shady Grove, Western and Pendorff areas.

17

¶60. Additionally, when addressing the Shady Grove parcel, the chancellor found that due to the population of the Shady Grove parcel, that parcel would naturally experience spillover growth from the City. However, the Shady Grove objectors submit that the path of growth is downtown, not toward the City's outer boundaries and that this factor does not support reasonableness. This Court has set out a number of factors to be considered when determining path of growth, such as: "(1) spillover development in annexation area; (2) annexation area immediately adjacent to City; (3) limited area available for expansion; (4) interconnection by transportation corridors; (5) increased urban development in annexation area; (6) geography; and (7) subdivision development." *Id.* Substantial and credible evidence supports the Shady Grove objectors' argument that annexation is not reasonable as to their parcel, taking the previously addressed factors into consideration. We therefore find that the chancellor erred when determining this factor was reasonable as to the Shady Grove parcel.

¶61. Regarding the Sharon parcel, the chancellor found it was not experiencing any significant growth and that annexation was not reasonable as to the Sharon parcel. Mayor Vincent testified that there have been no new subdivisions planned for the Sharon area. The City presents no argument regarding this factor beyond re-stating the chancellor's finding.

¶62. The chancellor's finding regarding the unreasonableness of the annexation of the Sharon parcel was supported by substantial and credible evidence.

**3)    Health Hazards**

This Court has established a number of factors to be considered when evaluating the reasonableness as related to potential health hazards which may or may not include: (1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions

18

which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage.

***In re Enlargement & Extension of the Boundaries of the City of Macon v. City of Macon,*** 854 So. 2d 1029, 1038 (Miss. 2003).

¶63.   The chancellor found "evidence of potential health hazards from the disposal of solid waste in other parts of the Pendorff, Western and Shady Grove parcels."

¶64.   However, regarding the annexation of the Shady Grove parcel, the chancellor found the health hazard factor did not support annexation by the City. The chancellor stated there was no evidence that anyone in the Shady Grove parcel is without adequate water service. The chancellor further found that Shady Grove is mostly rural and that septic tanks provide the most effective way of treating sewage and that he knew of no one in the area who had gotten sick because of improper treatment of sewage. The chancellor cited testimony from the superintendent of education for Jones County, members of the board of supervisors and residents who testified they were satisfied with their present services and that they knew of no one who had suffered any illness as the result of the use of septic tanks.

¶65.   Regarding the Sharon parcel, the chancellor cited testimony from environmental health specialist Jim Westin that a certain area in the Sharon parcel gave him concern regarding soil suitability and the use of septic tanks. However, Westin testified that there was only one main area of concern when you "look at the big picture of Sharon." Additionally, there was testimony from Elliot who stated that the few septic tank problems were violations of state regulations and could be dealt with by the Mississippi Department of Health if it would take these few landowners to Jones County Justice Court.

19

¶66. The chancellor found that the septic tank problems "were limited to a small area and not the sort of problems such that annexation would be the only remedy." Further, this Court has held the septic tank issue is "rather insignificant in the overall test of reasonableness." *In re Enlargement & Extension of the Mun. Boundaries v. City of Biloxi,* 744 So. 2d 270, 280 (Miss. 1999) (citations omitted). The City argues that the PAA is in need of a central sewer system and that installation of a central sewer system will address the sewer needs of the PAA in a timely manner. As will be discussed *infra,* the City also has no plans to implement this system in the immediate future.

¶67. Shady Grove cited testimony from a member of the city council that three weeks prior to trial, "all of the manholes on Fifth Avenue were overflowing." The city council member also stated he witnessed another manhole in the City overflowing and he went back to check it twice. Both times, he found the manhole still overflowing and raw sewage coming out of the manhole and flowing out of the street. Shady Grove contends that if the City is having these problems of their own, it should not annex more territory.

¶68. The chancellor's findings as to this factor were supported by substantial and credible evidence.

4)    **Financial ability to provide municipal services**

¶69. Mayor Vincent testified that the City had set aside $10 million for the first phase of services it intended to provide to the PAA. She testified that the City's "financial condition is healthy and robust. And we can afford to pay for these improvements."

¶70. The chancellor found that the City provided a thorough breakdown of its present financial condition, bonding capacity, projected revenue to be received from taxes in the PAA,

20

and the financial plan and department reports proposed for implementing the annexation. However, the chancellor found it was the City's burden to break down the costs of the annexation as to each parcel, and after searching the trial record, the chancellor found no such breakdown. The chancellor's opinion stated, "[t]he evidence showed that the city has no real idea of the cost of annexation or how the costs will be paid."

¶71.    The chancellor did find, however, that in light of the services needed, this factor favored annexation of the Western and Pendorff parcels. The chancellor found that the evidence showed that the Sharon parcel may not benefit from the services provided, as services such as a "backbone" sewage service may or may not be provided within the City's five-year time frame.

¶72.    The chancellor found that the annexation of the Shady Grove parcel would mean that the City would have to take over the obligation of the Shady Grove Utility District to provide water service. The chancellor found this would be a burden to the City and that "the annexation of Shady Grove would hamper the City in meeting its needs and increase costs to current residents." Furthermore, former Mayor Vincent testified she was not sure the City would be responsible for paying for the utility district and that it may only be required to pay the bond of indebtedness.

¶73.    The City submits that the evidence is undisputed that it is in good financial condition, submitting numerous exhibits to demonstrate same. The City also cites testimony from Demery Grubbs, an expert in municipal finance, wherein he stated, "[t]he City of Laurel is in excellent financial posture and has the ability to function as a viable municipal entity today." A credit profile issued by Standard and Poor's found that the City has "five

21

consecutive years of positive financial operations." Further, at the time of trial, "the City of Laurel had $12,579,945 in remaining general fund bonding capacity under the 15% rule" pursuant to Mississippi Code Annotated Section 21-33-303 (Rev. 2007). The City has demonstrated that it is in good financial condition overall.

¶74. Accordingly, we find that the chancellor's findings are supported by substantial and credible evidence.

**5)     The need for zoning and planning in the PAA**

¶75. The chancellor cited his previous findings in the "need for planning in the annexation area" factor. The chancellor found this factor favored annexation of the Western and Pendorff parcels, but not of the Shady Grove and Sharon parcels, because those parcels are largely rural. Furthermore, Sharon argues that since only 2 of the 150 businesses in the PAA are in their parcel, they have no need for the City's zoning ordinances.

¶76. All parties agree that Jones County has no zoning in place.[4] The City argues generally that all parcels would benefit from the zoning ordinances the City has in place and that its "regulations are better suited to an urbanizing area." However, based on the exhibits presented to this Court and the previous evidence examined by the chancellor, Sharon and Shady Grove are not "urbanizing areas."

¶77. We find that the chancellor did not err in finding annexation was not reasonable as to the Sharon and Shady Grove parcels, as his finding was supported by substantial and credible evidence.

---

[4]However, a data report prepared by Slaughter reveals that Jones County does have subdivision regulations.

**6)      The need for municipal services**

¶78.   The chancellor found that the need for municipal services should be focused on the Western and Pendorff parcels. The chancellor found this factor did not favor annexation as to the Sharon and Shady Grove parcels.

¶79.   The Ordinance for Enlarging, Extending and Defining the Corporate Limits and Boundaries states:

> The City of Laurel shall make the following improvements in said annexed territory to be completed within a reasonable time, not to exceed five years from the effective date of this ordinance, unless delayed by war or military preparedness:
> (a) improve existing streets or drainage;
> (b) install water lines, water service, sewage disposal lines, sewage treatment facilities and street lighting, where necessary and economically feasible;
> (c) said services shall be furnished in the same manner and to be the same extent as such services are being furnished to the present citizens of the municipality.

¶80.   The City refers to this provision as Phase I of the annexation.

¶81.   The ordinance further states:

> That the City of Laurel shall furnish to the said annexed territory the following municipal and public services in the same manner and to the same extent as such services are being furnished to the present citizens of the municipality, such services to begin on the effective date of this Ordinance, to wit:
>
> > (a) Police protection;
> > (b) Fire protection;
> > (c) Garbage removal;
> > (d) Trash and other debris removal;
> > (e) Pest control;
> > (f) Maintenance of existing streets;
> > (g) The right to exercise the ballot in municipal elections upon registering and meeting all statutory and constitutional requirements and upon proper approval of the changes created by this Ordinance under the Voting Rights Act of 1965, as amended, and the use and benefit of all other municipal services and

23

facilities furnished by the City of Laurel, Mississippi to all the
present citizens of the municipality.

¶82. Slaughter prepared a Summary of Services Offered by the City of Laurel vs. Services Offered to County Residents. He stated that the City would provide the following services which are not presently provided in the PAA:

    a) comprehensive planning
    b) zoning
    c) sign regulations
    d) building codes
    e) a housing code
    f) building inspections
    g) electrical code
    h) plumbing code
    i) mechanical code
    j) gas code
    l) fire code
    m) swimming pool code
    n) unsafe building abatement code
    o) sewer ordinance
    p) contractors examination, licensing and bonding
    q) mosquito and pest control [5]

¶83. The City additionally asserts that it would provide significantly better police protection, since it has sixty-one sworn officers, while the Sheriff's Department serving the PAA has sixty officers to serve all of Jones County. The City submits it will add three patrol officers, one juvenile officer, one civilian clerk and two dispatchers. Since we do not have this portion of the record, it is difficult to tell if the PAA would benefit from the City's police protection as Shady Grove and the City cite conflicting testimony. Shady Grove states that Laurel's Police Chief, Tim Waterson, testified that there was not a definite need for law enforcement in the PAA. In the City's brief, it cites the testimony of the Police Chief *Johnson*

---

[5]The chancellor's opinion states that the county does provide pest control.

24

that there is a need for regular municipal police patrol in the PAA. In his opinion, the chancellor stated that the superintendent of education for Jones County, the members of the board of supervisors representing the Shady Grove area, and several residents of the Shady Grove area testified they are satisfied with their law enforcement services. They testified that even the school in Shady Grove has its own officers who are deputy sheriffs.

¶84. The City asserts that fire protection will improve with annexation. The City is currently rated significantly higher in fire protection than the PAA. The City is rated a Class 5 in fire protection and the PAA is rated Class 8 and Class 10. The City states that in the first year following annexation, the City will purchase a tanker truck and that a new fire station will be located in the PAA and be staffed by ten full-time professional firefighters. Shady Grove counters this argument by pointing to evidence that the City has neglected to construct a new fire station in North Laurel even though it had been recommended that it do so; that the City had to sell land and use the money to make necessary repairs to bring its Twenty-Sixth Street Station back up to standard; and that the City had had to close one fire station without building a new one. Shady Grove cites the testimony of Larry Clark of the Mississippi State Rating Bureau, wherein he testified that "there are some deficiency points assigned to the City of Laurel for inadequate hydrants." Regarding the Sharon parcel, Laurel Fire Chief Steve Russell testified that most areas in Sharon would not have access to water for firefighting purposes, and that even after annexation, a great deal of the Sharon parcel would still be provided a form of rural fire protection. Chief Russell testified that the City would use a tanker to carry water to the PAA, although Shady Grove already has multiple tankers.

¶85. The City asserts that the Laurel City Council has committed to a program to improve both water and sewer service. The City further asserts that 33 percent of the dwellings in the PAA already receive sewer service from the City. Mayor Vincent stated in her testimony, and the City states multiple times throughout its brief, that it is committed to making such improvements within the first five years of the annexation.

¶86. Shady Grove cites the testimony of Robert C. Lunardini, a consulting engineer, who testified that under the City's plan, 72.6 percent of the PAA's residents would not be receiving municipal level water services after five years; that it would cost the City between 36.6 and 59 million dollars for the City to provide sewer services in the PAA. Lunardini also testified there was nothing in the City's services and facilities plan as to when 69 percent of the citizens would receive service. Furthermore, Sharon cites the testimony of Charles King, the City's water and sewer services expert that only limited services would be offered during Phase I and that "Phase I is a backbone plan, not a service plan."

¶87. In his opinion, the chancellor recognized that the Sharon parcel is mostly rural and municipal services are not wanted or needed. He further recognized that the Shady Grove area is satisfied with the county services it receives. This Court has held,

> The evidence shows that the residents of the proposed annexation area are already provided with the most basic and necessary of the municipal services. They currently have water services, garbage collection through the county, and police and fire protection. There is no substantial, credible evidence that a central connected sewer -- the service that is not provided, but most needed -- would be provided by Batesville within a reasonable time. Therefore, there is little evidence that better municipal services would result if annexation were allowed. . . .

*Committee Opposed to Annexation v. City of Batesville (In re Extension of Boundaries)*, 760 So. 2d 697, 705 (Miss. 2000).

¶88.   We find the chancellor did not err in finding that annexation of the Shady Grove and Sharon parcels is not reasonable as to this factor.

**7)   Natural Barriers**

¶89.   Regarding this factor, the chancellor cited his findings as to "Limitations Due to Geography and Surrounding Cities." The chancellor found that this factor supported annexation of all areas of the PAA. None of the parties present a contrary argument. However, regarding "Limitations Due to Geography and Surrounding Cities," we rejected the chancellor's finding that annexation of the Shady Grove area is reasonable as to this factor, based on the chancellor's own recognition that there are a lack of connecting streets and lack of evidence that any will be built by the City. Because of the same finding as to this factor, we find annexation was reasonable as to the Sharon parcel, but not the Shady Grove parcel.

**8)   Past Performance**

¶90.   In his opinion, the chancellor adopts the arguments of the objectors from Sharon and Shady Grove wherein they state that the past performance of the City has not been good because of the City's failure to provide adequate sewer service and failure to maintain the infrastructure within its own limits. Sharon's expert, Elliot, testified that the City has severe infiltration and inflow problems. Further, the fire chief testified of a fire in the City wherein the City had to rely on assistance from volunteer fire departments. Sharon and Shady Grove argue the City's failures should not be "rewarded" by allowing it to annex an area that would more than double the size of the municipality.

27

¶91. Nonetheless, the chancellor found that "[t]he City of Laurel has provided in a timely fashion for the capital improvements and municipal services required, and is dealing with problems common to all cities in a responsible manner." Substantial and credible evidence supported the chancellor's finding that this factor weighed in favor of annexation.

**9)      Economic or Other Impact on Residents and Property Owners**

¶92. The chancellor found that the economic or other impact factor favors annexation in the Western and Pendorff parcel, and "weakly favors" annexation of Sharon and Shady Grove. He concluded by stating, "[t]his factor favors the annexation of the Sharon and Shady Grove parcels, but to a much lesser degree." The Sharon objectors state "weakly" favoring should be viewed as not being favored at all.

¶93. The Shady Grove objectors point out that if annexed, their citizens will have to pay ad valorem taxes to the City. They further argue that even if improvements occur, they will not occur until Phase II, yet the residents would have to begin paying city taxes.

¶94. This Court has held,

> the mere fact that residents in the PAA will have to pay more taxes is insufficient to defeat annexation. Rather, this Court will "balance the equities by comparing the city's need to expand and any benefits accruing to the residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area."

*In re Enlargement & Extension of the Mun. Boundaries v. City of Biloxi*, 744 So. 2d 270 at 284 (citations omitted). While the chancellor did use the word "weakly," we find the chancellor balanced the equities, and did not err when he found that this factor favors annexation as to Sharon and Shady Grove.

**10)	Impact on Minority Voting**

¶95.	In the case of *In re The Extension of the Boundaries of the City of Columbus vs. the City of Columbus,* 644 So. 2d 1168, 1180 (Miss. 1994), this Court held that this factor must be raised by a person with standing. In the case sub judice, this issue was raised by Louis Goins, an African-American resident of the PAA, and James Jones, an African-American who is the former President of the Laurel and Jones County Chapters of the NAACP, as well as a former member of the Laurel City Council. Goins and Jones testified in opposition to the annexation.

¶96.	A data sheet reflecting the 2000 census shows the population of the City of Laurel to be 59.4 percent  non-white and 40.6 percent white. The chancellor's opinion states that the proposed annexation would bring into the City a population that is 73.2 percent white and 26.8 percent non-white.

¶97.	The chancellor stated that the City's brief and the transcript do not reveal the racial makeup of the Shady Grove parcel, and that the Shady Grove parcel is by far the largest parcel in the PAA, with a population of at least 4,500. The chancellor further added that the Sharon parcel was left out of the discussion, as a survey by Elliot revealed that almost 100 percent of the 124 houses there were occupied by whites.

¶98.	Both the chancellor and the objectors cite the testimony of Lusteck, who testified that in his involvement in many annexation cases, this case involved the largest dilution of black voting strength he had ever seen.

¶99.	Jones testified that it "takes greater than 65% to 70% minority vote to be elected" and that if the annexation is successful, African-Americans will not be able to hold office for long.

29

Shady Grove additionally cites the testimony of Jones Brogdon, who was a member of the Laurel City Council at the time the annexation was proposed. Brogdon testified that he recalled "talk about the school system. That we needed more whites in the school system. And that was the main reason, if I remember it, was to annex to get more whites into the City of Laurel."

¶100. In response, the City of Laurel submits that "the evidence established that the City of Laurel configured the proposed annexation so that no potential minority voters that were within any reasonable path of growth were excluded." Mayor Vincent testified that "to her knowledge, annexation will not have an impact on the black voting strength in Laurel."

¶101. Aside from asserting that the predominantly white Pendorff area is the wrong area which to grant annexation, the City makes no argument as to the reasonableness of this factor as applied to the Shady Grove and Sharon parcels.

¶102. The City cites the United States Supreme Court case of *City of Richmond v. United States* for the proposition that "it would be difficult to conceive of any annexation that would not change a city's racial composition at least to some extent." *City of Richmond v. United States*, 422 U.S. 358, 368, 95 S. Ct. 2296, 2302, 45 L. Ed. 2d 245, 254 (1975). The City further stated,

> In short, annexations do not violate Section 5 of the Voting Rights Act if:
> a) The purpose is not discriminatory
> b) There are now objectively verifiable, legitimate reasons for the annexation
> c) Wards are used to preserve voting strength of protected minorities

*See Id.* at 375, at 2306, at 259. The City quoted *City of Richmond* extensively, and stated in conclusion that it had "clearly established the non-discriminatory purposes of the annexation," but provides no evidence in support of this statement.

¶103. Based on the evidence provided to this Court, we find substantial and credible evidence supports the chancellor's finding that this factor was not reasonable as applied to the Sharon and Shady Grove parcels.

**11)    Enjoyment of Economic and Social Benefits of the Municipality without Paying a Fair Share of Taxes**

¶104. The chancellor found this factor favored annexation as to all parcels, as Laurel is the "economic hub of Jones County," providing the seat for county government, a recreation program, hospitals, churches and shopping.

¶105. However, the objectors state that when residents of the PAA enter the City, they pay sales taxes on the items they purchase and these sales taxes should qualify as their "fair share."

¶106. This Court in *Municipal Boundaries v. City of Madison*, 650 So. 2d 490, 504 (Miss. 1995), stated,

> Certainly these residents. . . use businesses located within the city. They shop at the grocery store and the drug store. They take their clothes to the laundry. They take their children to schools located within the city and to day care centers. They attend church in the city and other events and activities. . . .
>
> But in any event, certainly these citizens derive benefits from the close proximity to the City of Madison, and certainly they have done so without paying any taxes. And in the opinion of the court, if they're going to bring their dirty laundry into town, they ought to  at least help pay for the streets. The evidence suggests the reasonableness of the annexation.

31

¶107. The chancellor's finding is supported by substantial, credible evidence, and we find annexation is reasonable as to the Sharon and Shady Grove parcels regarding this factor.

12) **Other Factors**

¶108. The chancellor found that no other factors were necessary to reach a decision as to the reasonableness of the annexation.

*Conclusion of Indicia of Reasonableness:*

¶109. In annexation cases, this Court has held that "where there is conflicting, credible evidence, we defer to the findings below." *Bassett v. Town of Taylorsville,* 542 So. 2d at 921 (citations omitted). Additionally, we have stated, "Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence." *Id.* at 921. "We only reverse where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made." *City of Biloxi*, 744 So. 2d at 277.

¶110. The chancellor's opinion provided a thorough analysis of each of the twelve factors. Based on the evidence presented, the chancellor did not apply an erroneous legal standard and his findings were based on substantial, credible evidence. We affirm the chancellor's finding that annexation was not reasonable as to the Sharon and Shady Grove parcels.

**CONCLUSION**

¶111. The chancellor erred neither in his finding that House Bill 1730 is reasonable nor in his decision that annexation was unreasonable as to the Shady Grove and Sharon parcels. Accordingly, the judgment of the chancellor is affirmed.

32

¶112. **AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**